IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 1, 2003 Session

## STATE OF TENNESSEE v. MARCUS JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 01-07733, 34, 36    Bernie Weinman, Judge**

_____

**No. W2002-00987-CCA-R3-CD  - Filed September 4, 2003**

_____

Defendant, Marcus Johnson, was convicted by a jury in the Shelby County Criminal Court of felony murder and two counts of especially aggravated robbery. Defendant was sentenced to life imprisonment for the felony murder conviction and twenty years for each especially aggravated robbery conviction. The trial court ordered the twenty-year sentences to run consecutive to each other, and one twenty-year sentence to run concurrent with the life sentence, and the other to run consecutive with the life sentence. In this appeal as of right, Defendant argues that: (1) the trial court erred in denying his motion to suppress incriminating statements made by Defendant to the police; (2) the evidence at trial was insufficient to support his convictions beyond a reasonable doubt; and (3) the trial court erred in failing to instruct the jury as to the weight to be given to the supplemental jury charge. After a review of the record, we affirm Defendant's conviction for felony murder. We conclude, however, that the constitutional protections against double jeopardy require reversal of one of Defendant's convictions for especially aggravated robbery. Accordingly, we affirm one of Defendant's especially aggravated robbery convictions. We modify the other especially aggravated robbery conviction to aggravated assault and remand for resentencing, for the reasons stated herein.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed in part,
Reversed and Modified in part, and Remanded for Resentencing**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID G. HAYES, J., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Marcus Johnson.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Facts**

On December 28, 2000, Mike Ghannam was at the Discount Shop on Elvis Presley Boulevard in Memphis, Tennessee, where he worked as a manager. At around 9:00 or 10:00 p.m., Mr. Ghannam was making coffee. He was washing his hands at the sink when he heard Yehia Abu-Hamda, a store clerk who was in the office of the store, calling for him. He turned around and saw two black men wearing masks. They were standing at the door, shooting guns. He could not see their faces, but one man was tall and the other man was short. Mr. Ghannam was shot. He dropped to the floor and rolled towards the sink. He heard between seven and ten gunshots. Mr. Ghannam saw the taller man leaving the office. He saw him "put something like [a] gun, whatever being in his hand" in his jacket before leaving the store. The two men then left the store.

Mr. Ghannam was bleeding badly. Mr. Abu-Hamda had also been shot and he was lying on the floor, bleeding. Mr. Ghannam pushed the police security alarm under the cash register. He attempted to call 911, but the store phone was dead. He asked Mr. Abu-Hamda for his cell phone, and Mr. Abu-Hamda passed his cell phone to him over the table. Mr. Ghannam called 911. An ambulance arrived shortly thereafter. Mr. Ghannam was taken to the Regional Medical Center, where he remained for six nights. He had been shot in the left shoulder. Mr. Abu-Hamda died as a result of his gunshot wounds.

Carolyn Scott testified that she drove into the parking lot of the Discount Shop on the evening of December 28, 2000, and saw a turquoise blue Ford Contour parked in front of the door. A black male was driving the vehicle. The driver of the vehicle began to pull away slowly. He turned around in the parking lot and drove towards Ms. Scott's vehicle, stopped briefly, and then drove away. Ms. Scott went inside the store. She saw and smelled smoke. She did not see anybody behind the cashier's counter. She heard someone ask for help. She looked behind the counter and saw Mr. Ghannam and Mr. Abu-Hamda covered in blood. She ran out of the store and got inside her car to drive to the Mapco to get help. As she began to drive away, she saw the police arrive, and she ran over to talk to the officers.

Sergeant William Merritt of the Memphis Police Department was assigned to oversee the investigation. Sergeant Merritt testified that Defendant became a suspect in the case as the result of three separate Crime Stoppers tips. On the morning following the shooting, Defendant filed a burglary report with the police. Sergeant Merritt arrived at Defendant's residence, and he noticed three or four bandanas lying on the coffee table, which appeared to be tied together in a manner commonly used to disguise a person's face. This information had been received through one of the Crime Stoppers tips. Another tipster gave information about a driver's license that had been left at the scene of the shooting. Defendant was arrested on December 29, 2000, based on information received through the Crime Stoppers tips.

A Tennessee driver's license was recovered from the parking lot of the Discount Shop. A fingerprint analysis revealed Defendant's thumb print on the driver's license. The record reveals that the license did not belong to Defendant, the co-defendant, or either victim, but it does not reveal to whom the license belonged. A gunpowder residue test was not performed on Defendant's hands because of the amount of time that had elapsed between the shooting and Defendant's arrest.

On February 2, 2001, Sergeant Merritt assembled a photographic lineup that included Defendant's photograph to show to Carolyn Scott. Ms. Scott identified Defendant as the person she had seen driving the Contour in the parking lot of the Discount Shop on December 28, 2000. Ms. Scott testified that after the incident, but prior to the photographic lineup, she had seen a picture of Defendant in a television news report, in which Defendant was reported as a suspect in the shooting. Ms. Scott notified Sergeant Merritt upon seeing the photo of Defendant on the news.

Mr. Ghannam testified that between $1,400 and $1,600 in cash was taken from a cigar box under the counter where the cash register was located. As manager of the store, Mr. Ghannam conducted a daily inventory. Mr. Ghannam testified that he usually counted the money kept in the cigar box twice daily, once in the morning and once at night. Mr. Ghannam had opened the store on the morning of December 28, 2000, at 6:30 a.m. He left the store for a couple of hours in the afternoon and left his wife in charge of the store. He did not count the money when he returned to the store that afternoon. The store was closed for one week following the robbery and shooting. Mr. Ghannam testified that Sam Taylor was the owner of the store.

Defendant testified at trial. He testified that he had worked with his co-defendant Travis Parson at the Super Value on Elvis Presley Boulevard. He saw Mr. Parson at around 9:00 p.m. on December 28, 2000. Mr. Parson came to Defendant's apartment and said that he needed money to pay his lawyer. He told Defendant that he would get the money at the Discount Shop and asked Defendant to go there with him to be a "watch out." They walked to the store. Defendant testified that he never drove a turquoise Ford Contour. Mr. Parson carried a twenty gauge shotgun, and Defendant carried an AK-47 assault rifle. Defendant bought the assault rifle, already loaded, about three days prior to the offense. Defendant testified that he did not go inside the store. He stood in the doorway and propped open the door. When they arrived at the store, Mr. Parson "just swung the door open and fired a shot." Mr. Parson told Defendant to go inside with him, but Defendant refused. Mr. Parson then dropped his shotgun and "snatched the assault rifle from [Defendant] and went in." Defendant then heard about five more gunshots. Defendant saw Mr. Parson go behind the counter and take cigarettes and money from a cigar box under the counter. After they left the store, Defendant took the weapons to his apartment and put them in the ceiling to conceal them.

Defendant testified that before they went to the store, Mr. Parson showed him a driver's license that he had found on the ground at the apartments. He told Defendant that he was going to leave it at the store. Defendant held the license and looked at it to see if he recognized the person to whom it belonged. He did not know the person whose license it was, and he handed it back to Mr. Parson. Defendant testified that he is about five feet, five inches tall, and Parson is about six feet,

two inches tall. Defendant testified that he did not consume any drugs or alcohol before committing the offense, but that he did do so afterward.

*Defendant's Statements*

Defendant gave three statements to the police, which were all read to the jury by Sergeant Merritt. The first statement was taken on December 29, 2000. Approximately two and a half hours elapsed between the time when Defendant was first taken to the police station and when Sergeant Merritt began to interview Defendant. Defendant initially denied any involvement in the incident. Sergeant Merritt advised Defendant that he was a suspect in the case and that Merritt had received several Crime Stoppers tips implicating Defendant. Sergeant Merritt told Defendant that a driver's license had been found at the scene and was being tested for fingerprints. Sergeant Merritt advised Defendant of his *Miranda* rights, and Defendant signed a written waiver of his rights. Sergeant Merritt testified that Defendant did not express a desire to have an attorney present and indicated a willingness to talk to the police. In his statement, Defendant admitted that he was present at the shooting. He told Sergeant Merritt that he had seen a person named Tye Owens at around 8:30 p.m. on December 28, 2000, at the apartments in which he lived. Defendant stated:

> Well, I was walking through the apartments and I seen Tye and we was walking. He said he needed to go and take care of some business. He said I'll hit you with something if you'll be the watch out. I walked down there, he went in, I heard shots. So, I stepped to the door and I looked in. I seen blood on the floor. So, I stepped back and Tye came out. Then, we left. He went his way and I went my way.

Defendant told Sergeant Merritt that Owens was armed with "a rifle, long, black and brown. It was kind of long and it had a clip you all were talking about and it was curved." Defendant stated that he heard about five gunshots. "[Owens] walked in the door, I heard one shot. I walked to the door and heard about four more." Defendant stated that he saw Owens shooting the gun, holding it up to his shoulder. Defendant asked Owens why he shot the victims, and Owens responded, "[F]uck them bitches. He was the old man had caught him stealing or something. He was going to handle that." Defendant stated that Owens wore a disguise on his face. Defendant wore Owens' jacket zipped up around his face.

After Defendant gave the statement, Sergeant Merritt ran the name "Tye Owens" through the computer and obtained a photograph of an individual named Tye Owen. He showed the photograph to Defendant, and Defendant said that the person in the photograph was his uncle and not the same Tye Owens who he said had committed the offense. Sergeant Merritt attempted to verify the information given by Defendant and learned that it was incorrect. Sergeant Merritt received additional information regarding the accomplice and obtained a photograph of Travis Parson. On January 1, 2001, he showed the photograph to Defendant, and Defendant recognized the person in the photograph as the person he knew as Tye Owens.

On January 1, 2001, Defendant gave another statement to the police. Before the interview, Defendant executed another written waiver of his rights. Defendant did not indicate that he wanted an attorney and he appeared to understand what was happening. In his second statement, Defendant stated that the information he gave on December 29, 2000, implicating Tye Owens as the person responsible for the shooting, was false. He then stated that his accomplice had been someone named Travis, whose last name started with a "P." He had known Travis for about two months, and they had worked together at Church's Chicken on Elvis Presley Boulevard. Defendant stated that Travis had taken cigarettes from the store.

Sergeant Merritt testified that Defendant was reluctant to sign the statement after it was prepared. Sergeant Merritt testified:

> I asked him why he didn't want to sign the statement and he told me that he was afraid that we would take the statement and show it to Travis. He didn't want Travis to know that he had told what had occurred. I told him it was his choice as to whether or not he wanted to sign the statement or not. I sat there with him for maybe ten or fifteen minutes. He sat there and just stared at the statement and he finally signed it.

After Travis Parson was arrested for his involvement in this offense, Defendant gave a third statement on January 5, 2001. Defendant signed another written waiver of his rights. Defendant stated that on December 28, 2000, he participated in the robbery of the Discount Shop on Elvis Presley Boulevard and the shooting of Yehia Abu-Hamda. He stated that he was armed with an AK-47, but he did not fire any shots during the robbery. He purchased the assault rifle for $200 at Gaston Park a few days before the robbery. He stated that "Travis [whose] last name started with a 'P'," also participated in the offense and that he used a twenty gauge shotgun. Someone named "Red," who also lived in the apartments, had given the shotgun to Travis on the night of the incident. He stated that money and cigarettes were taken from the store. The money was taken from a cigar box, but he did not know how much money was taken. He stated that he received $100 for his participation in the offense. Defendant stated:

> Me and Travis was at my house. He left went and got the twenty gauge. Come back with the gun about nine-thirty. We left and went to the Discount Shop. Travis opened the door and fired one shot, dropped the gun and got the AK from me. I saw about four more shots. He went behind the counter and got the money and the cigarettes and then we left. I took the guns to my apartment and he went his way. That's it.

Defendant stated that he was standing beside Parson when Parson fired the twenty gauge shotgun. When Parson fired the AK-47, Defendant was standing in the doorway, holding the door open. Defendant stated that it was "kind of both [their] idea" to rob the store. He also stated that Parson found a driver's license on the ground outside the store. Defendant grabbed it to see if he knew whose it was. He did not know whose license it was, and he handed it back to Parson.

Sergeant Merritt testified that during each interview, Defendant was given a meal and allowed access to the restroom. Defendant was also allowed to make several phone calls during one of the interviews. Sergeant Merritt did not at any time threaten Defendant, and he did not make any promises to Defendant in exchange for his statements.

## Motion to Suppress Statements

Defendant contends that the trial court erred in denying his motion to suppress the three statements that he gave to the police. Defendant argues that he did not voluntarily and knowingly waive his constitutional rights against self-incrimination because: (1) he gave the first statement while under the influence of drugs and alcohol; and (2) the second statement was coerced by verbal and physical intimidation by police officers. Defendant further argues that all subsequent statements should therefore have been suppressed from evidence. *See State v. Smith*, 834 S.W.2d 915 (Tenn. 1992).

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this Court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to the facts, however, is reviewed *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984).

At the hearing on the motion to suppress the statements, Sergeant Merritt testified that Defendant was developed as a suspect in the investigation as a result of three Crime Stoppers tips. A source of one of the tips revealed that Defendant had confessed his involvement in the shooting. The tipster provided Defendant's address and gave a description of his appearance. The tipster also informed the police that Defendant had told her that he dropped someone's driver's license at the scene of the crime. A driver's license that did not belong to Defendant, the co-defendant, or either victim was found at the scene, and that information had not yet been released to the news media.

On December 29, 2000, Defendant made a burglary report to the police. When Sergeant Merritt arrived at Defendant's apartment, Officer Worthy was already inside the apartment with Defendant's consent. Sergeant Merritt did not see Defendant drinking alcohol, and he did not smell marijuana. Sergeant Merritt saw, lying on the table, some bandanas that were tied together as if to mask a person's face. The victim, Mr. Ghannam, told the police that the gunmen had worn masks. Defendant's girlfriend gave her consent to search the apartment, but the police found no other incriminating evidence. While the police were at Defendant's apartment, they received another tip, that Defendant and Travis Parson had been seen walking through the apartment complex with an

AK-47 and bandanas tied around their faces. Based on the information provided by the Crime Stoppers tips, Defendant was arrested.

Upon arriving at the police station, Sergeant Merritt questioned Defendant regarding his educational and work background. Defendant stated that he dropped out of high school, but that he had attempted to obtain his GED. Sergeant Merritt determined that Defendant was able to read the Advice of Rights form. Sergeant Merritt then advised Defendant of his *Miranda* rights. Defendant stated that he understood his rights and was willing to talk to the police without an attorney present. Defendant signed the Advice of Rights form. Sergeant Merritt interviewed Defendant regarding the events of December 28, 2000. The interview was reduced to writing. Defendant was again advised of his rights, and he then signed the typewritten statement of the interview.

In the time between Defendant's first and second statements to the police, Travis Parson became a suspect in the investigation. On January 1, 2001, Sergeant Merritt took another statement from Defendant. Sergeant Merritt advised Defendant of his rights, and Defendant indicated that he understood those rights. Sergeant Merritt also told Defendant that he had been charged with first degree murder in the perpetration of a robbery. Defendant signed another Advice of Rights form. Before the second interview with Defendant was reduced to writing, Sergeant Merritt received a telephone call from Defendant's mother. Defendant was allowed to speak privately with his mother and to make several other phone calls.

Initially, Defendant hesitated to sign the second statement because, in the statement, Defendant had implicated Mr. Parson. Defendant eventually signed the statement in Sergeant Merritt's presence. Sergeant Merritt testified at the hearing that he told Defendant "that [he] knew this information about Tye Owen was incorrect" and encouraged Defendant to "tell the truth." Sergeant Merritt testified that he "still left it up to [Defendant] to decide whether or not he was going to sign the statement or not." After about twenty minutes, Defendant signed the statement.

Sergeant Merritt interviewed Defendant again on January 5, 2001, because there were inconsistencies between Defendant's and Mr. Parson's versions of the events of December 28, 2000. Sergeant Merritt again advised Defendant of his *Miranda* rights, and Defendant signed a third Advice of Rights form. Sergeant Merritt took Defendant's third statement, and Defendant signed the typewritten statement. Sergeant Merritt testified that the third statement was more detailed than the first two statements and was the most consistent with the evidence already gathered up to that point in the investigation.

Sergeant Merritt testified that Defendant was never threatened or forced to give a statement. He was provided meals and was not kept in the interview room for an extended period of time. Defendant did not appear to be under the influence of drugs or alcohol, and he appeared to understand what was happening. Defendant did not indicate at any time during the three interviews that he wanted an attorney present. Several days following his third statement to the police, Sergeant Merritt attempted to take a fourth statement from Defendant. Defendant told Sergeant Merritt that his family had hired an attorney, and that he would not make any further statements.

-7-

Defendant testified at the suppression hearing that he was arrested at his residence at around 11:30 a.m. on December 29, 2000. During the twelve hours prior to his arrest, he and Travis Parson drank a fifth of brandy and smoked marijuana. Defendant testified that while under the influence of marijuana and alcohol, he called the police to report a burglary, and police officers arrived at his residence at around 9:00 a.m. Defendant testified that he was intoxicated when police officers arrived at his apartment. Defendant testified, however, that he knew where he was and understood what was happening. Defendant testified that he was not asked any questions before being advised of his rights. Defendant testified that he was still under the influence of drugs and alcohol when he began speaking with Sergeant Merritt that afternoon at around 3:00 p.m.

Defendant testified that during the first interview, Sergeant Barrom, the other interviewing officer, spoke loudly and in a forceful manner, "putting his hand all in my face, tell him this, and if you don't tell me this, we're going to charge you with this such and such." Defendant also testified that Sergeant Barrom "touched [him] physically three times," "putting his hand on [Defendant's] head and stuff like that." At the hearing, defense counsel asked Defendant if Sergeant Barrom "threaten[ed] [him] with any other physical contact besides poking [him] in the head?" Defendant answered, "No." Defendant testified that Sergeant Barrom told him that if Defendant told the officers what happened, he would not be charged with first degree murder. Defendant testified that the officers made no other promises or threats. Regarding the second statement, Defendant testified that he understood the charges against him and that the officers did not make any promises or threaten him physically. Defendant testified that he was not forced or pressured to give the second statement and that he was not under the influence of alcohol or drugs at the time he gave the second statement. Defendant testified, however, that Sergeant Barrom pressured him into signing the second statement.

Defendant testified that he understood at all times that he had the right to speak with an attorney and not to answer any questions. Defendant told police officers before the first interview that he attended Westwood High School through the tenth grade and that he was attempting to obtain his GED. Defendant read all three statements before signing each one, and he did not ask for a lawyer. Defendant admitted that he was not truthful in all of his statements to the police.

The trial court denied Defendant's motion to suppress all three statements made to police officers. The trial court found that Defendant was advised of his rights prior to each interview and that he understood what was happening during the interviews. The record does not preponderate against the trial court's findings, and we agree with the trial court's conclusion that Defendant gave each statement freely, voluntarily, and intelligently.

Defendant contends that at the time he gave his first statement to the police, he was under the influence of drugs and alcohol. Before an accused is entitled to have his statements suppressed on the grounds that he was under the influence of alcohol or narcotic drugs, it must be established that his faculties were so impaired that the statement could not be considered "the product of a free mind and rational intellect." *State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1981) (citing *Lowe v. State*, 584 S.W.2d 239, 241 (Tenn. Crim. App. 1979)).

We conclude that the trial court was correct in finding that Defendant's first statement to the police was freely and voluntarily made. Defendant himself testified that his intoxication did not prevent him from understanding his rights and the circumstances surrounding the statement. Defendant argues that his inaccurate account of the facts in his first statement was the result of his intoxication. "[A] statement provided by a suspect who is under the influence of drugs is admissible so long as the statement is coherent." *State v. Perry*, 13 S.W.3d 724, 738 (Tenn. Crim. App. 1999). Defendant testified at the hearing on the motion to suppress that he was not truthful in his first statement to the police. Although Defendant's account of the events of the previous night was false, it was not incoherent.

We also agree with the trial court's finding that Defendant's statements were not the product of intimidation, coercion, or deception. Defendant testified at the hearing that Sergeant Barrom spoke loudly and intimidated him. Defendant also testified, however, that during all of the interviews, he understood that he had the right to an attorney and to refuse to answer the officers' questions. Defendant did not invoke his right to remain silent until Sergeant Merritt's attempt to take a fourth statement. Sergeant Merritt testified that during all of the interviews, Defendant was given food and drink and access to the restroom, and during the second interview, Defendant was given the opportunity to make several phone calls in private. The trial court accredited the officer's testimony, finding that the statements "were not extracted by any sort of threat of violence nor obtained by any direct or implied promises nor by the exertion of any improper influence." Defendant has not established by a preponderance of the evidence that his statements were not voluntary. Defendant is not entitled to relief on this issue.

**Sufficiency of the Evidence**

Defendant contends that the evidence at trial was insufficient to support his convictions. When an accused challenges the sufficiency of the convicting evidence, we must determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Keough*, 18 S.W.3d 175, 180-81 (Tenn. 2000) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979)). In evaluating the sufficiency of the evidence, this Court will afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). Questions regarding the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). Furthermore, a guilty verdict replaces the presumption of innocence with a presumption of guilt, and the defendant has the burden of demonstrating on appeal why the evidence does not support the jury's findings. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2002). Robbery is defined as "the intentional or knowing theft of property from

the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401 (1997). An especially aggravated robbery occurs when a defendant commits a robbery with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403 (1997).

Defendant argues that the evidence at trial was insufficient to support his conviction for the especially aggravated robbery of Mike Ghannam because Mr. Ghannam was not present at the store in an employee capacity, and therefore, the State failed to prove beyond a reasonable doubt the "taking of property" element of robbery. Defendant argues that because Mr. Ghannam was not working at the store at the time of the offense and did not have any ownership rights in the store, he was not a victim of robbery. Defendant also argues that Mr. Ghannam did not become aware of any missing money or merchandise until six days after the incident, and he could not testify as to the exact contents of the cigar box under the counter.

Viewed in a light most favorable to the State, the evidence is clearly sufficient to establish that Defendant committed an especially aggravated robbery. Mr. Ghannan, a store manager, and the deceased victim, Mr. Abu-Hamda, were both present at the store at the time of the offense. There is nothing in the record to indicate that Mr. Ghannam, a store manager, was not working at the time of the offense. Mr. Ghannam testified that he had been with Mr. Abu-Hamda in the store office immediately prior to the offense. Mr. Ghannam testified that he saw two black men enter the store carrying weapons. Defendant admitted that he and Travis Parson entered the store carrying a shotgun and an assault rifle. Mr. Ghannam testified that he saw the two men firing shots.

Mr. Ghannam testified that he took inventory of the contents of the cigar box on the morning of December 28, 2000. Although Mr. Ghannam did not testify as to how he arrived at the figure he gave in his testimony, the jury was allowed to infer from his testimony that based on the receipts from the sales that occurred that day, there should have been between $1,400 and $1,600 in the cigar box. Defendant testified that he saw Travis Parson take cigarettes and money from a cigar box under the counter, and in one of his statements to the police, Defendant stated that he received $100 for his participation in the offense. Mr. Abu-Hamda was shot and killed during the course of the robbery. Viewed in a light most favorable to the State, the evidence is clearly sufficient to support Defendant's convictions for especially aggravated robbery and felony murder.

**Double Jeopardy**

We conclude, however, that Defendant cannot be convicted of two separate charges of especially aggravated robbery. Defendant was indicted for the especially aggravated robbery of each victim. There was no evidence presented at trial that property belonging individually to each victim was taken. *See Moore v. State*, 563 S.W.2d 215 (Tenn. Crim. App. 1977). Our review of the record reveals that the evidence supports only one robbery, and dual convictions for especially aggravated robbery violate the principles of double jeopardy.

Where an error in the criminal proceedings is found to affect the substantial rights of the defendant, the error may be noticed at any time, even though not raised in the motion for new trial

or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice. Tenn. R. Crim. P. 52(b).

Both our federal and state constitutions protect persons from being "twice put in jeopardy" for the same offense. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 10; *State v. Lewis*, 958 S.W.2d 736, 738 (Tenn. 1997). The Double Jeopardy Clause contains three protections. It protects against: (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656, 664-65 (1969); *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996).

This Court recently held, in a case with similar circumstances, that a single incident of robbery involving two victims constitutes the same offense. *State v. Irvin Lee Franklin and Jerry Lorenze Sandridge*, 2003 Tenn. Crim. App. LEXIS 568, No. W2002-00945-CCA-R3-CD (Tenn. Crim. App. at Jackson, June 27, 2003), *app. for perm. to app. pending*. A panel of this Court stated, "the proper unit of prosecution for aggravated robbery in Tennessee is the number of thefts, rather than the number of victims." *Id.* This Court relied upon the Tennessee Supreme Court's holding in *State v. Lewis*, 958 S.W.2d 736 (Tenn. 1997), in which the Court held that a defendant could not be convicted of multiple counts of aggravated arson where he set fire to a single apartment building that contained several individual apartments. This Court reasoned that the statute defines robbery in terms of theft. *See* Tenn. Code Ann. § 39-13-401(a). In this case, there was only one theft or taking of property. Furthermore, the distinguishing characteristic between the offense of robbery and the offense of theft is the manner in which property is taken, which is by violence or fear. *See State v. Owens*, 20 S.W.3d 634, 638 (Tenn. 2000). A taking may be accomplished by the threat of fear or violence regardless of whether there is a single victim or multiple victims involved. Because the only taking in this case occurred when co-defendant Parson took cash and cigarettes from behind the store counter, Defendant can be convicted of only one especially aggravated robbery.

Defendant is nevertheless guilty of a crime against each victim. The evidence supports the finding that both victims were made to reasonably fear imminent bodily injury by use or display of a deadly weapon, which constitutes the offense of aggravated assault. Tenn. Code Ann. § 39-13-102(a)(1)(B), -101(a)(2) (1997 & Supp. 2002). Under the test established in *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999), aggravated assault is a part (a) lesser-included offense of especially aggravated robbery. *See State v. Jason C. Carter*, 2000 Tenn. Crim. App. LEXIS 340, No. M1998-00798-CCA-R3-CD (Tenn. Crim. App., filed at Nashville, April 27, 2000), *perm. to appeal denied* (Tenn. 2000). As alleged in the indictment, each element of aggravated assault is included in the elements of especially aggravated robbery.

The record reveals that Defendant entered the Discount Shop armed with an AK-47. Mr. Ghannam testified that he heard several shots and feared for his life. As to the deceased victim, Mr. Abu-Hamda, we conclude that the evidence clearly supports Defendant's conviction for especially aggravated robbery. Mr. Abu-Hamda, a store clerk, was standing behind the counter where the money and cigarettes were located, and he was shot and killed. The especially aggravated robbery

of Mr. Abu-Hamda is the "triggering offense" which establishes the felony murder conviction. Without depreciating the seriousness of the attack upon Mr. Ghannam, we conclude that the evidence more appropriately supports a conviction for aggravated assault against Mr. Ghannam under the facts and circumstances of this case.

Accordingly, Defendant's conviction for the especially aggravated robbery of Mr. Abu-Hamda is affirmed. Defendant's conviction for the especially aggravated robbery of Mr. Ghannam is modified to aggravated assault, and this case is remanded to the trial court for resentencing on that offense.

**Consecutive Sentencing**

In this appeal, Defendant does not allege error in the trial court's sentencing determination. We note, however, that the trial court ordered Defendant's twenty-year sentence for the especially aggravated robbery of Mr. Ghannam to run consecutively to his sentences for the especially aggravated robbery and felony murder of Mr. Abu-Hamda. We further observe that the trial court did not specifically state its findings of fact in support of its order of consecutive sentencing.

It appears from the record that the trial court found Defendant to be a "dangerous offender" in order to justify consecutive sentencing. *See* Tenn. Code Ann. § 40-35-115(b)(4) (1997). Once a trial court determines that a defendant is statutorily eligible for consecutive sentencing as a "dangerous offender," it should also determine whether consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender, and (3) are congruent with the general principles of sentencing. Tenn. Code Ann. § 40-35-115 (1997), Sentencing Commission Comments; *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

> Regarding the order of consecutive sentencing, the trial court stated in full:
> Based on the facts and circumstances of the case, and certainly based on the fact that there was this extremely danger – of course, obviously any weapon is dangerous – this weapon that was extreme potential for death and bodily injury that was possessed by the defendant, and under the facts and circumstances, the court – and the disregard for human life – the court is of the opinion that the sentences, of course, in 01-07736 and the murder charge and 01-07733, the especially aggravated robbery, those two should be run concurrent, but consecutive to the offense against the other victim in 01-07734, the other especially aggravated robbery.

The trial court failed to state specific findings on the record in order to justify consecutive sentencing. *See Wilkerson*, 905 S.W.2d at 939; *see also Lane*, 3 S.W.3d at 461. As we are remanding this case for resentencing on a conviction for aggravated assault, we also reverse the order of consecutive sentencing and remand for the trial court to reconsider the appropriateness of consecutive sentencing and for specific findings to be made if consecutive sentencing is ordered.

Moreover, we would note that we are unable to reconcile the trial court's imposition of consecutive sentences. The court ordered each twenty-year sentence for especially aggravated robbery to be served consecutively for an effective forty-year sentence. The court then separated the consecutive nature of the sentences by ordering one of the twenty-year sentences to be served concurrent with the life sentence and one twenty-year sentence to be served consecutive to the life sentence, which is in conflict with the imposition of an effective forty-year sentence. The trial court's order, as structured, would leave a gap in the service of the twenty-year sentences. A twenty-year sentence will be served prior to serving a life sentence. By ordering the twenty-year sentences consecutive to each other, the defendant will arguably serve both twenty-year sentences prior to his service of the life sentence. If the intended total effective sentence for all three convictions was life plus forty-years, the trial court should have ordered both twenty-year sentences to be consecutive to each other and consecutive to the life sentence. If the trial court intended to impose a total effective sentence of life plus twenty years, it should have ordered one twenty-year sentence to be served concurrently with the life sentence and one twenty-year sentence to be served consecutively to the life sentence without ordering the two twenty-year sentences consecutive to each other.

**Supplemental Jury Instruction**

Defendant contends that the trial court erred in failing to instruct the jury not to give any greater weight to the supplemental instruction than the original instruction.

Regarding criminal responsibility, the trial court's original instruction to the jury was as follows:

> The defendant is criminally responsible for an offense committed by another if the defendant solicits, directs, aids, or attempts to aid another person to commit an offense, and the defendant acts with intent to promote or assists the commission of the offense or to benefit in the proceeds or results of the offense.
>
> Mere presence alone is not sufficient to make a person criminally responsible.

During its deliberations, the jury presented the following question to the trial court, "If the defendant is criminally responsible for the conduct of another, how does this determination affect the first element of Killing in the Perpetration of Robbery which refers to unlawful killing by the defendant?"

In response to the jury's question, the trial court gave the following supplemental instruction:

> The defendant is criminally responsible as a party to the offense of Murder During the Perpetration of a Robbery if the offense was committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.
>
> The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission

of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.

A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for another offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.

In deciding the criminal responsibility of the defendant, the jury may also take into consideration any evidence offered that the defendant attempted to thwart or withdraw from any of the offenses that followed from the original offense.

Before you find the defendant guilty of being criminally responsible for said offense committed by the conduct of another, you must find that all the essential elements of said offense have been proven by the state beyond a reasonable doubt.

It is well settled that a trial court may provide supplemental instructions in response to jury questions. *State v. Forbes*, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). When a trial court gives the jury supplemental instructions, "the better practice is to admonish the jury not to place undue emphasis on the supplemental instructions." *State v. Bowers*, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001) (citing *Leach v. State*, 552 S.W.2d 407, 408 (Tenn. Crim. App. 1977)). Defense counsel objected to the supplemental instruction, but she did not specifically request an admonishment by the trial court. Whether the failure to give such an admonishment is reversible error depends upon whether the omission might reasonably be expected to prejudice the defendant in light of the entire record. *Id.* Based on the entire record in this case, we cannot conclude that the error more probably than not affected the outcome of the trial, and therefore the error was harmless. *See* Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

**CONCLUSION**

After a careful review of the record, we conclude that dual convictions for especially aggravated robbery violate double jeopardy where no property was taken from each individual victim, but rather from the store. Accordingly, we affirm Defendant's convictions for especially aggravated robbery and felony murder pertaining to the victim Mr. Abu-Hamda. We reverse Defendant's other conviction for especially aggravated robbery and modify it to aggravated assault and remand for resentencing on that offense. We further reverse the order of consecutive sentencing and remand that issue to be considered at the time of the new sentencing hearing for the offense of aggravated assault.

_____

THOMAS T. WOODALL, JUDGE