IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 1, 2009

**JERRY SANDRIDGE v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Lauderdale County**
**No. 7119     Joseph H. Walker, III, Judge**

---

**No. W2009-00261-CCA-R3-PC  - Filed September 18, 2009**

---

The petitioner, Jerry Sandridge, was convicted of two counts of aggravated robbery and, upon his direct appeal, this court modified one of the convictions to aggravated assault and remanded for resentencing.  The resentencing was affirmed on direct appeal.  On January 15, 2009, the petitioner filed a petition for post-conviction relief, asserting prosecutorial misconduct and denial of the effective assistance of counsel.  Concluding that the petition was untimely, the post-conviction court dismissed it without a hearing, and this appeal resulted.  Following our review, we affirm the dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and CAMILLE R. MCMULLEN, JJ., joined.

Jerry Sandridge, Tiptonville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; and Cameron L. Hyder, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This court set out the facts of the matter in the direct appeal of the petitioner's convictions:

On the morning of September 22, 2000, Howard Hutcherson was working behind the counter of the Amoco market in Ripley, Tennessee.  He was working with Mary Jasani, one of the owners, who was behind the counter with him.  Mr. Hutcherson testified that he had just looked at the clock and noticed that it was 7:10 when a black man came into the store brandishing a handgun and entered the area behind the counter where he and Ms. Jasani were.  The armed man demanded all the money from the cash register and told Mr. Hutcherson to open the register.  Mr.

Hutcherson did so, and the man then took the money from the register and placed it in a plastic bag. The gunman then told Mr. Hutcherson and Ms. Jasani to go into the market's restroom. On his way to the restroom, Mr. Hutcherson saw another black man, who appeared to be the gunman's cohort. No one else was in the store.

Mr. Hutcherson and Ms. Jasani remained in the bathroom for a couple of minutes. When they emerged, the two black men were gone. Mr. Hutcherson called the police.

Mr. Hutcherson subsequently viewed several photographic line-ups. On the day of the robbery, he identified Defendant Franklin as one of the suspects. He further testified at trial that he believed Defendant Franklin was the man who came behind the counter with the gun. Five days after the robbery, Mr. Hutcherson viewed another photographic line-up and identified a James Hall as the unarmed man. On April 10, 2001, Mr. Hutcherson viewed two more photographic line-ups, neither of which contained a photograph of Defendant Franklin. During the April viewing, Mr. Hutcherson identified Daniel Scott, Defendant Sandridge, and a man named Anthony D. Thompson as suspects. During cross-examination at trial, however, Mr. Hutcherson stated, "As far as I know, I don't know Mr. Sandridge."

Christy Bonds testified that, on the morning in question, she was walking into the Amoco market as two black men were leaving. She testified that they were "nearly running," and one of the men bumped into her. She watched the two men go to a car parked in the carwash, get in, and then slide down in the seats, as if to hide. There was already a driver seated in the car. Ms. Bonds described the car as blue with a white top. She left the station in her car and got on Hwy. 51 headed toward Covington. On the road, she saw the blue and white car again. She noticed the license plate number and memorized it. When she passed the car, she saw the three men in it. When she got to her workplace, she heard that the Amoco market had been robbed. She then called the police and reported the description of the car and the license plate number. She subsequently reviewed three photographic line-ups, from which she identified Defendant Franklin, Defendant Sandridge and a James Hall as the men she had seen. She testified that Defendant Sandridge was the man she had bumped into at the market, and James Hall was the driver.

Carolyn McBroom, the County Clerk for Lauderdale county, testified that the license plate number reported by Ms. Bond was assigned to a car registered to Defendant Franklin.

Officer Rita Burnett testified that she drove by Carolyn Franklin's residence while patrolling on September 30, 2000; Carolyn Franklin was married to Defendant Franklin. At the end of Ms. Franklin's driveway, Officer Burnett found Defendant Sandridge, Daniel Scott and another man. Defendant Sandridge's car was stuck in

a ditch. Officer Burnett testified that Defendant Sandridge told her that he was looking for Carolyn Franklin.

Officer Burnett also testified that Defendant Franklin came to the police department on October 6, 2000, saying that he had heard they were looking for him. Defendant Franklin told Officer Burnett that he had not done anything. Defendant Franklin subsequently made a handwritten statement, which provides:

> On 9-22-00 at Approximately 1:35 am or 1:30 am I left the Horseshoe Casino down in Tunica Mississippi headed toward or too [sic] Ripley. At approximately 7:00 am or 6:55 am I arrived at Amoco[.] I parked my car in the Second Stall counting back toward left. I then got out my car and was thinking about washing it up. I then had to use the Rest Room. I went into the Amoco gas station and used their Rest Room and left.

After Defendant Franklin issued this statement, Investigator Terrance Mitchell arrested him. Officer Mitchell also searched Defendant Franklin's car but found nothing.

Daniel Scott pled guilty to the robbery of the Amoco market and testified at trial. Scott testified that the robbery had been Defendant Franklin's idea. He explained that he, Defendant Franklin and Defendant Sandridge had been to the casino the night before, and Franklin drove them to Ripley that morning from the casino. Franklin told the other two men that he knew the Amoco market and could not go in because he would be recognized. Scott described the crime:

> Well, when we got there--when we were in the store--well, Irvin Franklin went in first to check to see if everything was, you know, going to be all right. He went in more or less to check it out. And he came back to the car, and [Defendant Sandridge] and I went in, and [Sandridge] pulled a pistol on the people who was in the--the clerks who was behind the counter. After giving him the money, they were told to go into a restroom. And after that, we left, got in the car and left.

Scott described the clerks as one man and one woman. He described the gun as a handgun.

The three men split the money three ways. Scott testified that Defendant Sandridge purchased a Lincoln a short time later. Scott explained that this was the car that Officer Burnett subsequently found stuck in the ditch outside Carolyn Franklin's residence.

Lieutenant Steve Sanders investigated the robbery and testified that the gun had never been recovered. He stated that $8,700 had been stolen, none of it recovered. He explained that Carolyn Franklin's residence was one-half mile from the Amoco station. Lt. Sanders also stated that, after Defendant Franklin had been arrested, he told the Lieutenant that he had been the driver in the robbery. Franklin also told him that Scott had participated in the crime.

With respect to Defendant Sandridge, Lt. Sanders testified that Sandridge had purchased a car on September 25, 2000, and that he lived on the same street as Scott. Lt. Sanders admitted on cross-examination that, in a previous proceeding where they were both present, Mr. Hutcherson had looked at Defendant Sandridge and stated that he had never seen him before.

Sam Goodman testified on behalf of Defendant Franklin, stating that he had been at the Amoco on the morning in question waiting on his ride. At about seven, he saw a brown or tan car leaving the station at a high rate of speed. He testified that he did not see Franklin's car there that morning.

Tony Deck also testified on behalf of Defendant Franklin, echoing Mr. Goodman's testimony that he saw a rusty-colored car leaving the station at a high rate of speed that morning. There were three black persons in the car. His sighting occurred right after the robbery had been committed. Mr. Deck testified that he did not see Defendant Franklin's car at the station.

Lou Nettie Thompson testified that Defendant Franklin had been renting a room from her in September 2000, and that she saw him on the morning in question at about 7:15 or 7:20. She cooked him breakfast, and he later drove her to see her sister-in-law.

Emma Sandridge testified on behalf of her son, Defendant Sandridge. She explained that her son had been living with her at the time in question and that he was with her on the morning of the robbery. She testified that there had been some problems between her son and Scott and that Scott had called the police on her son. She testified that she barred Scott from her home. She acknowledged that her son bought a Lincoln in the latter part of September.

Defendant Sandridge testified, stating that he had been home on the morning in question. He acknowledged purchasing the Lincoln, claiming that he paid for it with money he had saved over a period of time. He testified that he had never been to the Ripley Amoco. He explained his presence at Carolyn Franklin's residence as resulting from his giving Daniel Scott a ride there at Scott's request.

State v. Franklin, 130 S.W.3d 789, 791-93 (Tenn. Crim. App. 2003).

The petition for post-conviction relief made the following claims: (1) either the State failed to provide "discovery" to petitioner's trial counsel or, if it was provided, counsel was ineffective in not then providing copies to the petitioner; and (2) counsel was ineffective for failing to communicate with the petitioner before and during the trial, for not responding to the petitioner during the appeal process, and for not keeping the petitioner "appraised [sic] of the law and any relevant facts related to his case." Additionally, he asserts that there was "witness tampering and witness badgering" during his trial and that it lacked a "spirit of fairness"; the proof was insufficient to sustain the verdict; and trial counsel did not "object to all the constitutional errors presented by the prosecution at trial." In a separate petition filed the same day, the petitioner explained that he did not file his post-conviction petition within the one-year period for making such claims: "Because the Trial Court has not responded to my motions for Trial Transcripts. Neither was I provided a copy of the motion of discovery. Due process violation, violation of 14th Amendment to U.S. Constitution."

On January 21, 2009, the post-conviction court entered its order of dismissal, concluding that the petition was untimely:

> On January 15, 2009, the petitioner filed a [p]etition for [p]ost-conviction relief.
>
> Petitioner was convicted by [a] Lauderdale County jury in 2001 of aggravated robbery with a deadly weapon. He was on parole at the time of the commission of the offense. He was sentenced to life without parole as a repeat violent offender. The sentence was consecutive to the sentence for which he was on parole.
>
> The conviction was upheld on appeal. See State v. [Franklin and] Sandridge, 13[0] S.W.3d 789. One conviction was remanded for re-sentencing. The sentencing was upheld on appeal. See State v. Sandridge, 2005 Tenn. Crim. App. LEXIS 489, No. W2004-01199-CCA-R3-CD.
>
> The court has reviewed the petition per T.C.A. 40-30-106.
>
> The [c]ourt finds that the petition was not timely filed. A person in custody under a sentence of this state must petition for post-conviction relief under this part within one (1) year of the date on which the judgment became final. T.C.A. 40-30-102. The court lacks the jurisdiction to hear the claim for post-conviction relief, since claims for post-conviction must be filed within one year.
>
> If it plainly appears from the face of the petition, any annexed exhibits or the prior proceedings in the case that the petition was not filed in the court of conviction or within the time set forth in the statute of limitations, the judge shall enter an order dismissing the petition. T.C.A. 40-30-106.

It is therefore ORDERED that the petition is dismissed[.]

The petitioner filed a notice of appeal and asserts why, in his view, his petition was timely filed:

The trial court incorrectly dismissed the [petitioner's] petition for post-conviction relief because the petition was not barred by the one-year statute of limitations, had the post conviction court viewed the issues in a different light, a denial of due process would have tolled the running of the statute.

As we understand the petitioner's arguments on appeal, the trial infirmities, of which he complains, each violated his right to due process, thus, in his view, tolling the running of the statute of limitations.

Under the Post-Conviction Procedure Act of 1995, a claim for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a) (2006).

The post-conviction statute contains a specific anti-tolling provision, stating:

The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file the action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the expiration of the limitations period.

Id. Subsection (b) of the statute sets forth the three narrow exceptions under which an untimely petition may be considered: (1) when the claim is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized at the time of trial and which requires retrospective application; (2) when the claim is based upon new scientific evidence establishing that the petitioner is innocent; and (3) when a previous conviction that was not a guilty plea and which was used to enhance the petitioner's sentence has been held to be invalid. Id. § 40-30-102(b).

None of the above narrow exceptions exists in this case. In fact, all of the petitioner's complaints regard alleged occurrences during his trials or the appeal process.

Simply calling a complaint a "due process" violation, as the petitioner has done, does not result in the tolling of the statute of limitations. Examples of matters in which due process claims

have been examined make this clear. <u>See</u> <u>Sample v. State</u>, 82 S.W.3d 267, 273 (Tenn. 2002) (concluding that statute of limitations should be tolled due to a late arising suppression of exculpatory evidence claim); <u>Williams v. State</u>, 44 S.W.3d 464, 477 (Tenn. 2001) (finding that misrepresentation by attorney as to continuing representation, rather than mere attorney negligence, possibly tolled the statute of limitations); <u>Seals v. State</u>, 23 S.W.3d 272, 278-79 (Tenn. 2000) (concluding that statute of limitations should be tolled during period of mental incompetence of petitioner); <u>Sands v. State</u>, 903 S.W.2d 297, 301 (Tenn. 1995) (concluding that due process required tolling because grounds for relief arose after the statute of limitations normally would have run); <u>Burford v. State</u>, 845 S.W.2d 204, 206 (Tenn. 1992) (holding that due process required tolling of statute of limitations because the petitioner was unable to file post-conviction claim in one county until conviction in another county had been set aside).  We conclude, therefore, that the post-conviction court did not err in summarily dismissing the petition.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the dismissal of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE