# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs June 22, 2010


## STATE OF TENNESSEE v. PATRICK POPE


**Appeal from the Circuit Court for Maury County**
**No. 16944     Robert L. Jones, Judge**

———————————

**No. M2009-01473-CCA-R3-CD - Filed August 25, 2010**

———————————

Appellant, Patrick Pope, was indicted by the Maury County Grand Jury in March of 2007 for aggravated burglary, aggravated assault, aggravated robbery, and aggravated kidnapping. After a jury trial, Appellant was found guilty on all counts. Appellant was sentenced to an effective sentence of eleven years. After a hearing on the motion for new trial, the trial court entered a judgment of acquittal on the conviction for aggravated kidnapping. The trial court denied the remainder of the motion for new trial, and Appellant has appealed. On appeal, the following issues are presented for our review: (1) whether the evidence was sufficient to support the convictions; (2) whether the accomplice testimony was adequately corroborated; (3) whether the trial court properly sentenced Appellant. After a review of the record, we determine that the accomplice testimony was adequately corroborated by direct and circumstantial evidence, that the evidence was sufficient to support the convictions, and that the trial court properly sentenced Appellant to an effective sentence of eleven years. Accordingly, the judgments of the trial court are affirmed.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Rhonda Hooks-Kendricks, Columbia, Tennessee, for the appellant, Patrick Pope.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Mike Bottoms, District Attorney General, and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

On July 28, 2006, Shirley and Hugh Hazard were asleep in their bedroom located at 216 Gardendale in Columbia, Tennessee. Mrs. Hazard had fallen asleep in her bedroom chair and awoke to hear a "racket" in the kitchen. The sounds that she heard led her to believe that someone was in their home. Mr. Hazard was bedridden and relied on a wheelchair to move around as as well oxygen that was suppled by a machine that was located in the hallway outside their bedroom.

Mrs. Hazard continued to hear noises and sat up "half dozed" as two men appeared in her bedroom. She was not wearing her glasses but could see that the two men had what appeared to be t-shirts tied around their faces. The men were also wearing shorts and tennis shoes. Both of the men had guns. Mrs. Hazard described the men as one being "bigger" with "a tattoo on his belly" that looked like "vines growing" or "wiggly-looking things."

The men demanded money, guns, and drugs. Mrs. Hazard assured the men that they "didn't have any" but told the men, "if you can find it, you can have it." The larger man kept the gun in one hand and had what appeared to be a sock on his other hand. He used the sock to pull open drawers and wipe down surfaces after he touched them. The larger man was the one who looked through the house, while the other man "stood back and watched."

The larger man asked where the phone was located and pulled the cord out of the wall with his foot. The larger man told Mrs. Hazard that they were going to take her car. He demanded to know where the keys were located. Mrs. Hazard told him where the keys were located. After the man with the tattoo found the keys, he made sure they were the right keys. Mrs. Hazard confirmed that he had found the correct keys, and the man put them in his pocket.

Mrs. Hazard was afraid to move and told the men to "go ahead and shoot us." Mr. Hazard told the men that they were "old and sick" and would "be better off dead." The men told them they were not going to shoot them because it was not their "time."

The men left the bedroom, and Mrs. Hazard could hear the oxygen machine switch to "on." One of the men told them that he was "turning it back on." Soon after that she heard the men leave. Mrs. Hazard looked out of the window to see the men driving away in her car, a green Saturn. Mrs. Hazard ran next-door and called her son.

-2-

In addition to the car, the men took Mrs. Hazard's purse, a billfold, a cell phone, a Uniden wall phone, a camera, and various prescription medications. Mrs. Hazard was unable to identify Appellant as the man with the tattoo. Mr. Hazard died approximately two-and-a-half weeks after the incident.

Officer John Ussery of the Columbia Police Department responded to a call at 7:22 a.m. on July 26, 2006, at the Hazard residence on Gardendale. After talking with the victims, Officer Ussery was able to determine that the suspects had entered the home through a rear window to a sunroom. The screen had been removed. Officer Ussery described the condition of the house as ransacked.

Officer Scott Knudsen received a "be on the lookout for" a green Saturn on the morning of July 26, 2006. Officer Knudsen located a car matching that description in the yard of 606 West Fourth Street. Outside the vehicle he noticed two dark-complected, African-American men. One of the men had tattoos on his stomach. The men were between five feet seven inches and six feet tall. The men were gone by the time that he confirmed that this was the missing car. Officer Knudsen received permission from the owner of the residence for consent to search the property. A Uniden telephone was found in a trash can near the car and a green Gatorade bottle was found inside the car in the center console. Mrs. Hazard had told police a bottle of lemon-lime Gatorade had been taken from her refrigerator. Officer Knudsen could not identify Appellant as one of the men standing near the car. Officer Knudsen secured the scene and the car was eventually dusted for fingerprints.

A few days after the incident, Appellant, also known as "Patman" or "Pacman," and Darius Hawkins were developed as persons of interest. Mr. Hawkins came into the police department for an interview accompanied by his mother. Mr. Hawkins gave a very detailed statement that he and Appellant were involved in the incident. The police attempted to get Appellant to come in for an interview. He agreed to come into the office but never showed up. After juvenile petitions were taken out against Appellant, he turned himself in and requested an attorney.

Appellant was eventually indicted by the Maury County Grand Jury in March of 2007 for aggravated burglary, aggravated assault, aggravated robbery, and aggravated kidnapping.

At trial, Darius Hawkins testified against Appellant. According to Mr. Hawkins, the two men spent the night at Mr. Hawkins's mother's house on the night of the incident. They left the house around 2:00 or 3:00 a.m. and started walking. Appellant gave Mr. Hawkins a .25 caliber semiautomatic pistol before they left the house. Appellant was carrying a .380 semiautomatic pistol. Mr. Hawkins stated the conversation was about "pulling a lick" or "going to do a robbery." Appellant had the idea for the activity.

-3-

Just before dawn, the men randomly chose to burglarize the victims' home. They took a screen off of a window and went inside the house. Mr. Hawkins stated that they started searching for "some money, or something" inside the house when they heard a noise. When Mr. Hawkins turned around, Appellant was gone. Mr. Hawkins exited the house through the window and met Appellant walking up the street. They agreed to return to the house to "do it this time."

The men again entered the house through the window in the sunroom. They had their pistols in their hands and had tied their t-shirts around their faces. Mr. Hawkins testified that he and Appellant entered a bedroom and "seen [sic] two old people in the bed." According to Mr. Hawkins, he stayed in the bedroom while Appellant searched the rest of the house. Mr. Hawkins tried to "keep [the victims] calm." Appellant had a sock on his hand and used to it wipe down the things that he touched in order to avoid leaving fingerprints. At one point, Appellant came back to the bedroom and told Mr. Hawkins to search the house.

Appellant had a plastic bag full of "pill bottles" and a bottle of Gatorade from the refrigerator. Appellant asked the victims where to find the car keys. Appellant also unplugged a cordless phone and took it with him. The two men left in the car that belonged to the victims. Appellant was the driver. Mr. Hawkins took a purse from the house that contained a billfold. The men drove the car to an address on West Fourth Street where Appellant threw the pill bottles and "a little pouch" in the trash. Appellant also threw away the cordless phone.

The house belonged to a man named "GP." Mr. Hawkins had been at the house earlier in the day and claimed that there were a lot of African-America men that hung out there on a regular basis.

Mr. Hawkins and Appellant saw the police approaching and ran to Appellant's house. When the police drove by, Mr. Hawkins was standing by the trunk of the car, and Appellant was standing near the trash can. At Appellant's house, Mr. Hawkins gave the gun back to Appellant, and then the men went to sleep.

During the investigation, police obtained fingerprints from the stolen vehicle and the point of entry at the home. They also collected DNA from the Gatorade bottle found in the vehicle. The DNA from the Gatorade bottle matched the DNA profile of Appellant. The fingerprints on the passenger front door and door handle from the vehicle belonged to Mr. Hawkins. Appellant's fingerprints were found on the outside window frame and window of the sunroom at the victims' residence.

At the conclusion of the jury trial, Appellant was convicted of aggravated burglary, aggravated assault, aggravated robbery, and aggravated kidnapping. After a sentencing hearing, the trial court sentenced Appellant to six years for aggravated burglary, five years for aggravated assault, eleven years for aggravated robbery, and eleven years for aggravated kidnapping. The sentences were ordered to run concurrently.

Appellant filed a motion for new trial. After the hearing on the motion for new trial, the trial court granted a judgment of acquittal as to the conviction for aggravated kidnapping, in accordance with *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991), and *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997). The remainder of the motion for new trial was denied. Appellant filed a timely notice of appeal.

*Analysis*
*Corroboration of Accomplice Testimony*

Appellant argues that his convictions are not valid because they were based on the uncorroborated testimony of accomplice Mr. Hawkins. Specifically, Appellant argues that the testimony of Mr. Hawkins "was the sole evidence implicating [Appellant] and establishing [Appellant's] identity." The State disagrees, arguing that both direct and circumstantial evidence in addition to the testimony of Mr. Hawkins established that Appellant was guilty of the offenses.

We agree with Appellant that convictions may not be based solely upon the uncorroborated testimony of accomplices. *See State v. Robinson*, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate such testimony. *See State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). More specifically, precedent provides that:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must[,] of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

*State v. Griffis*, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (quoting *Sherrill v. State*, 321 S.W.2d 811, 815 (Tenn. 1959)). In addition, our courts have stated that:

The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

*Id.* at 589 (footnotes omitted). Furthermore, we note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. *See id.* at 588; *State v. Maddox*, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997).

Appellant concedes that there is evidence placing him at the victim's home in the form of his fingerprints on the outside window. Additionally, Appellant concedes that somehow his DNA ended up on a Gatorade bottle found in the victim's stolen car. In addition to the direct evidence that Appellant acknowledges, the testimony of Mrs. Hazard indicated that one of the perpetrators had a tattoo on his stomach. While she could not specifically identify Appellant as that man, the jury was entitled to consider Mrs. Hazard's testimony along with the other physical evidence that placed Appellant at the scene of the crime. When the jury heard this evidence in addition to the testimony of Mr. Hawkins, they concluded that the proof supported more than an inference of Appellant's mere presence or more than a suspicion of his involvement in this home invasion. Again, we note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. *See Griffis*, 964 S.W.2d at 588; *Maddox*, 957 S.W.2d at 554. There is ample evidence that corroborates Mr. Hawkins' testimony.

### Sufficiency of the Evidence

Appellant challenges the sufficiency of the evidence to sustain his convictions for aggravated burglary, aggravated assault, aggravated robbery, and aggravated kidnapping.[1] The State argues that the "evidence was more than sufficient for the jury to make its findings of guilty beyond a reasonable doubt."

---

[1] The trial court granted a motion for judgment of acquittal on the conviction for aggravated kidnapping at the hearing on the motion for new trial. Appellant includes a challenge to the sufficiency of the evidence for this conviction in his statement of the issues raised on appeal but does not address this conviction in his brief.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions of witness credibility, the weight and value of evidence, and resolution of conflicts in the evidence are entrusted to the trier of fact. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).

## A. Aggravated Burglary

Burglary is committed when a person "without the effective consent of the property owner . . . [e]nters a building other than a habitation . . . not open to the public, with intent to commit a felony, theft or assault." T.C.A. § 39-14-402(a). Aggravated burglary is the burglary of a habitation. T.C.A. § 39-14-403(a). "Aggravated burglary is a property offense and is completed upon entry into the habitation." *State v. Cowan*, 46 S.W.3d 227, 234 (Tenn. Crim. App. 2000) (citing T.C.A. § 39-14-402(a)(1), -403(a); *State v. Ralph*, 6 S.W.3d 251, 255 (Tenn. 1999)).

Appellant complains that Mrs. Hazard could not identify him as the perpetrator who invaded her home and that there was no corroboration of Mr. Hawkins' testimony that would suggest that Appellant reentered the home after the two men initially entered the sunroom and left after hearing a noise. Appellant acknowledges that he could be found guilty of criminal trespassing as the evidence establishes his first entry into the residence.

The evidence, in a light most favorable to the State, establishes that Appellant and his accomplice, Mr. Hawkins, entered the home of Shirley and Hugh Hazard by removing a

window screen in the sunroom. Mr. Hawkins heard a noise, turned around, and noticed that Appellant was gone. When Mr. Hawkins caught up with Appellant down the street, the men agreed to go back to the house to "do it." Once back inside the home, the men confronted the elderly couple at gunpoint, searched the home, and took items from the home as well as the victims' car without the Hazards' effective consent. Appellant's prints were discovered on the window of the sunroom. There is ample evidence that Appellant entered the habitation with the intent to steal what he could. As stated above, the offense of aggravated burglary is a completed upon entry into the habitation. *Cowan*, 46 S.W.3d at 234. Appellant is not entitled to relief on this issue.

## B. Aggravated Assault

Tennessee Code Annotated section 39-13-102(a)(1)(B) stated that, "A person commits aggravated assault who . . . [i]ntentionally or knowingly ['causes another to reasonably fear imminent bodily injury'] . . . and . . . [u]ses or displays a deadly weapon . . . ." (quoting T.C.A. § 39-13-101(a)(2)).

Appellant contends that the evidence was insufficient to sustain a conviction for aggravated assault because the evidence failed to establish a separate incident of aggravated assault. Instead, Appellant argues that the assault was incident to the robbery. Once again, Appellant relies on the lack of corroboration of Mr. Hawkins's testimony. As an aside, Appellant contends that if this Court "finds that the evidence was sufficient to uphold the conviction for aggravated robbery, this Court should find that the aggravated assault is incidental to the aggravated robbery and maybe should be a lesser included offense."

We agree with Appellant that the identity of the perpetrator is an essential element of any crime. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). However, like any other requisite element, sufficient proof of the perpetrator's identity may be established through circumstantial evidence alone. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Again, it is the jury that decides the appropriate weight to be given circumstantial evidence and any inferences that may be drawn therefrom. *Odom*, 928 S.W.2d at 23.

Again, the proof at trial consisted of both direct and circumstantial evidence of Appellant's involvement in the incident at the home of Mr. and Mrs. Hazard. In addition to the testimony of accomplice Mr. Hawkins and victim Mrs. Hazard, the forensic evidence placed Appellant at the scene of the crime with a weapon. Mrs. Hazard testified that the perpetrator had a tattoo on his stomach but could not say that it was identical to the one that Appellant had on his stomach. The jury was presented with the evidence and was convinced that Appellant was indeed the perpetrator. Appellant is not entitled to relief on this issue.

Appellant makes an additional claim that his due process rights were violated by dual convictions for aggravated assault and aggravated robbery in violation of *Anthony*. We disagree. The Tennessee Supreme Court has made it clear that the due process analysis set forth in *Anthony* arises from the broad nature of the Tennessee kidnapping statute and is, most often, inapplicable in other contexts. *See Cowan*, 46 S.W.3d at 234; *Ralph*, 6 S.W.3d at 256 n.5. Further, "a single aggravated robbery of two victims may support a separate conviction for aggravated assault, which is also a lesser included offense of aggravated robbery." *State v. Franklin*, 130 S.W.3d 789, 798 (Tenn. Crim. App. 2003) (upholding convictions for both aggravated assault and aggravated robbery where there were two victims to the crime). The testimony indicated that both Appellant and Mr. Hawkins were brandishing guns when they entered the victims' home. Mrs. Hazard testified that she was scared by the armed intruders and thought that she was going to be shot. The evidence supports the conviction for aggravated assault. Appellant is not entitled to relief on this issue.

### C. Aggravated Robbery

Appellant was convicted of aggravated robbery. Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). A robbery becomes aggravated either when the victim is seriously injured or when the defendant "display[s] . . . any article used . . . to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a).

Appellant again challenges the testimony with regard to his identity as the perpetrator of the crime. Specifically, Appellant argues that he could not be identified by the victim or by the officer that found the Saturn. As noted above, there was ample evidence from both forensics and the accomplice to establish Appellant's identity as the perpetrator. Appellant's identity was a question of fact to be resolved by the jury. After examining the testimony, the fingerprint evidence, and the DNA evidence that linked Appellant to the Gatorade bottle found inside the stolen vehicle, the jury convicted Appellant as charged despite the inability of any of the witnesses to specifically identify Appellant. The evidence was sufficient to support this conviction. Appellant is not entitled to relief on this issue.

### Sentencing

Lastly, Appellant challenges his sentence. Specifically, Appellant argues that the trial court erred by ordering him to serve eleven years in confinement when the trial court enhanced the sentence by finding that Appellant was the leader in the commission of the offense, that the victim was particularly vulnerable due to age, and that a firearm was used in the commission of the offense of aggravated burglary. Appellant argues that his sentence

is excessive and the trial court failed to make the required findings "to support maximum sentencing." The State contends that the trial court properly sentenced Appellant.

"When reviewing sentencing issues . . . , the appellate court shall conduct a *de novo* review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination, a trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses, (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). When imposing the sentence within the appropriate sentencing range for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2006).

At the outset we note that Appellant committed the criminal offenses at issue in July of 2006, therefore, the 2005 amendments to the sentencing act apply to our review of his sentencing. The 2005 amendments to the sentencing act made the application of the enhancement factors advisory in nature. *See* T.C.A. § 40-35-114; *State v. Jackie Lynn Gray*, No. M2007-02360-CCA-R3-CD, 2008 WL 2579175, at *5 (Tenn. Crim. App., at Nashville, June 28, 2008), *perm. app. denied*, (Tenn. Dec. 29, 2008); *State v. Troy Sollis*, No. W2007-00688-CCA-R3-CD, 2008 WL 1931688, at *3 (Tenn. Crim. App., at Jackson, May, 2, 2008). In fact, "[T]he 2005 amendments [to the sentencing act] deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). After a review of the lengthy transcript from the sentencing hearing, it is clear that the trial court considered the nature and characteristics of the criminal conduct involved, Appellant's history and background, the mitigating and enhancement factors, and the principles of sentencing. *See id.* at 345-46.

The trial court applied enhancement factor (2), that the defendant was a leader in the commission of an offense involving two criminal actors. T.C.A. § 40-35-114(2). While the trial court noted, as pointed out by Appellant, that there was some confusion as to who held a gun on the victims during the majority of the robbery, the trial court found ultimately that the "great weight" of the proof supported Appellant as the leader of the offenses as to all but the kidnapping count, for which the trial court ultimately granted a motion for judgment of acquittal.

The trial court also applied enhancement factor (4), "the victim was particularly vulnerable because of age or physical or mental disability." T.C.A. § 40-35-114(4). Appellant argues that there is no proof that "her age" supports the application of this enhancement factor. To the contrary, the trial court noted that Mrs. Hazard seemed to be "quite healthy" and based the application of this enhancement factor on the physical well-being of Mr. Hazard, who "was on around-the-clock concentration of oxygen" and required the use of a wheel chair to get around. The trial court also considered that Appellant possessed a firearm during the commission of the offense but determined that this enhancement factor could only be used with respect to the aggravated burglary conviction because the use of a firearm was a statutory element of the other convictions. T.C.A. § 40-35-114(9). Appellant does not contest the application of enhancement factor (13), that Appellant was released on juvenile court supervision at the time of the instant offenses or that the juvenile adjudication was for an act that would have been a felony offense if committed by an adult. T.C.A. § 40-35-114(13), (16). Further, Appellant does not challenge the application of enhancement factor (3), that the offense involved more than one victim, or (10), that the risk to human life was high, to certain convictions. T.C.A. § 40-35-114(3), (10). The record supports the existence of each applied enhancement factor and reflects that the trial court considered all the proper criteria in sentencing, as well as stating the reasons

for the sentence on the record.  The trial court's imposition of an effective eleven-year sentence is affirmed.  This issue is without merit.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
JERRY L. SMITH, JUDGE