IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 4, 2003 Session

## STATE OF TENNESSEE v. IRVIN LEE FRANKLIN
## and JERRY LORENZE SANDRIDGE

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7119-C     Joseph H. Walker, III, Judge**

---

**No. W2002-00945-CCA-R3-CD  - Filed June 27, 2003**

---

The Defendants, Irvin Lee Franklin and Jerry Lorenze Sandridge, were each convicted by a jury of two counts of aggravated robbery.  In this direct appeal, both Defendants challenge the sufficiency of the evidence.  Defendant Franklin further contends that double jeopardy principles require the reversal and dismissal of one of the convictions.  We find the evidence sufficient to support the jury's determination that each of these Defendants committed an aggravated robbery.  However, because the facts and circumstances of this offense support only one conviction for aggravated robbery as to each Defendant, we modify the other aggravated robbery convictions to aggravated assault and remand for resentencing on that offense.  In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part;**
**Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., joined.

William Dan Douglas, Jr., Ripley, Tennessee, for the appellant,  Jerry Lorenze Sandridge and Clifford McGown, Waverly, Tennessee, for the appellant, Irvin Lee Franklin.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Elizabeth Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On the morning of September 22, 2000, Howard Hutcherson was working behind the counter of the Amoco market in Ripley, Tennessee.  He was working with Mary Jasani, one of the owners, who was behind the counter with him.  Mr.  Hutcherson testified that he had just looked at the clock

and noticed that it was 7:10 when a black man came into the store brandishing a handgun and entered the area behind the counter where he and Ms. Jasani were. The armed man demanded all the money from the cash register and told Mr. Hutcherson to open the register. Mr. Hutcherson did so, and the man then took the money from the register and placed it in a plastic bag. The gunman then told Mr. Hutcherson and Ms. Jasani to go into the market's restroom. On his way to the restroom, Mr. Hutcherson saw another black man, who appeared to be the gunman's cohort. No one else was in the store.

Mr. Hutcherson and Ms. Jasani remained in the bathroom for a couple of minutes. When they emerged, the two black men were gone. Mr. Hutcherson called the police.

Mr. Hutcherson subsequently viewed several photographic line-ups. On the day of the robbery, he identified Defendant Franklin as one of the suspects. He further testified at trial that he believed Defendant Franklin was the man who came behind the counter with the gun. Five days after the robbery, Mr. Hutcherson viewed another photographic line-up and identified a James Hall as the unarmed man. On April 10, 2001, Mr. Hutcherson viewed two more photographic line-ups, neither of which contained a photograph of Defendant Franklin. During the April viewing, Mr. Hutcherson identified Daniel Scott, Defendant Sandridge, and a man named Anthony D. Thompson as suspects. During cross-examination at trial, however, Mr. Hutcherson stated, "As far as I know, I don't know Mr. Sandridge."

Christy Bonds testified that, on the morning in question, she was walking into the Amoco market as two black men were leaving. She testified that they were "nearly running," and one of the men bumped into her. She watched the two men go to a car parked in the carwash, get in, and then slide down in the seats, as if to hide. There was already a driver seated in the car. Ms. Bonds described the car as blue with a white top. She left the station in her car and got on Hwy. 51 headed toward Covington. On the road, she saw the blue and white car again. She noticed the license plate number and memorized it. When she passed the car, she saw the three men in it. When she got to her workplace, she heard that the Amoco market had been robbed. She then called the police and reported the description of the car and the license plate number. She subsequently reviewed three photographic line-ups, from which she identified Defendant Franklin, Defendant Sandridge and a James Hall as the men she had seen. She testified that Defendant Sandridge was the man she had bumped into at the market, and James Hall was the driver.

Carolyn McBroom, the County Clerk for Lauderdale county, testified that the license plate number reported by Ms. Bond was assigned to a car registered to Defendant Franklin.

Officer Rita Burnett testified that she drove by Carolyn Franklin's residence while patrolling on September 30, 2000; Carolyn Franklin was married to Defendant Franklin. At the end of Ms. Franklin's driveway, Officer Burnett found Defendant Sandridge, Daniel Scott and another man. Defendant Sandridge's car was stuck in a ditch. Officer Burnett testified that Defendant Sandridge told her that he was looking for Carolyn Franklin.

Officer Burnett also testified that Defendant Franklin came to the police department on October 6, 2000, saying that he had heard they were looking for him. Defendant Franklin told Officer Burnett that he had not done anything. Defendant Franklin subsequently made a handwritten statement, which provides:

> On 9-22-00 at Approximately 1:35 am or 1:30 am I left the Horseshoe Casino down in Tunica Mississippi headed toward or too [sic] Ripley. At approximately 7:00 am or 6:55 am I arrived at Amoco[.] I parked my car in the Second Stall counting back toward left. I then got out my car and was thinking about washing it up. I then had to use the Rest Room. I went into the Amoco gas station and used their Rest Room and left.

After Defendant Franklin issued this statement, Investigator Terrance Mitchell arrested him. Officer Mitchell also searched Defendant Franklin's car but found nothing.

Daniel Scott pled guilty to the robbery of the Amoco market and testified at trial. Scott testified that the robbery had been Defendant Franklin's idea. He explained that he, Defendant Franklin and Defendant Sandridge had been to the casino the night before, and Franklin drove them to Ripley that morning from the casino. Franklin told the other two men that he knew the Amoco market and could not go in because he would be recognized. Scott described the crime:

> Well, when we got there -- when we were in the store -- well, Irvin Franklin went in first to check to see if everything was, you know, going to be all right. He went in more or less to check it out. And he came back to the car, and [Defendant Sandridge] and I went in, and [Sandridge] pulled a pistol on the people who was in the -- the clerks who was behind the counter. After giving him the money, they were told to go into a restroom. And after that, we left, got in the car and left.

Scott described the clerks as one man and one woman. He described the gun as a handgun.

The three men split the money three ways. Scott testified that Defendant Sandridge purchased a Lincoln a short time later. Scott explained that this was the car that Officer Burnett subsequently found stuck in the ditch outside Carolyn Franklin's residence.

Lieutenant Steve Sanders investigated the robbery and testified that the gun had never been recovered. He stated that $8,700 had been stolen, none of it recovered. He explained that Carolyn Franklin's residence was one-half mile from the Amoco station. Lt. Sanders also stated that, after Defendant Franklin had been arrested, he told the Lieutenant that he had been the driver in the robbery. Franklin also told him that Scott had participated in the crime.

With respect to Defendant Sandridge, Lt. Sanders testified that Sandridge had purchased a car on September 25, 2000, and that he lived on the same street as Scott. Lt. Sanders admitted on

cross-examination that, in a previous proceeding where they were both present, Mr. Hutcherson had looked at Defendant Sandridge and stated that he had never seen him before.

Sam Goodman testified on behalf of Defendant Franklin, stating that he had been at the Amoco on the morning in question waiting on his ride. At about seven, he saw a brown or tan car leaving the station at a high rate of speed. He testified that he did not see Franklin's car there that morning.

Tony Deck also testified on behalf of Defendant Franklin, echoing Mr. Goodman's testimony that he saw a rusty-colored car leaving the station at a high rate of speed that morning. There were three black persons in the car. His sighting occurred right after the robbery had been committed. Mr. Deck testified that he did not see Defendant Franklin's car at the station.

Lou Nettie Thompson testified that Defendant Franklin had been renting a room from her in September 2000, and that she saw him on the morning in question at about 7:15 or 7:20. She cooked him breakfast, and he later drove her to see her sister-in-law.

Emma Sandridge testified on behalf of her son, Defendant Sandridge. She explained that her son had been living with her at the time in question and that he was with her on the morning of the robbery. She testified that there had been some problems between her son and Scott and that Scott had called the police on her son. She testified that she barred Scott from her home. She acknowledged that her son bought a Lincoln in the latter part of September.

Defendant Sandridge testified, stating that he had been home on the morning in question. He acknowledged purchasing the Lincoln, claiming that he paid for it with money he had saved over a period of time. He testified that he had never been to the Ripley Amoco. He explained his presence at Carolyn Franklin's residence as resulting from his giving Daniel Scott a ride there at Scott's request.

Initially, the Defendants challenge the sufficiency of the evidence, particularly with respect to their identities as the perpetrators. Additionally, Defendant Sandridge asserts that there is not sufficient evidence to corroborate the testimony of accomplice Daniel Scott.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102,

105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

An aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-13-401(a), 39-13-402(a)(1). The proof at trial in this case established that two men entered the Amoco market. One of the men accosted the two clerks with a handgun and demanded the money from a cash register. After collecting the money from the register, the armed man and his accomplice left the store. These facts are sufficient to establish that an aggravated robbery was committed at the Amoco market.

Christy Bonds testified that she saw two black men leaving the Amoco market in a hurry. The two men got into a car already manned by a driver. The car was registered to Defendant Franklin. Defendant Franklin admitted in his written statement that he was at the Amoco at the time in question. Lt. Sanders testified that Defendant Franklin subsequently admitted to having been the driver in the robbery. Daniel Scott testified that the robbery had been Defendant Franklin's idea. This evidence is sufficient to establish Defendant Franklin's identity as one of the perpetrators, beyond a reasonable doubt. Accordingly, this issue is without merit.

Scott also testified that Defendant Sandridge had been the gunman in the robbery. In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 214 Tenn. 171, 379 S.W.2d 34, 43 (1964). Our supreme court has described the nature of the required corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the

defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App.1992)). Whether sufficient corroboration exists is generally a determination for the jury. See Bigbee, 885 S.W.2d at 803.

With respect to Defendant Sandridge, Scott's testimony was sufficiently corroborated by Ms. Bond's and Mr. Hutcherson's identifications of him from photographic line-ups; proof that he purchased a car a few days after the robbery; and his presence at Carolyn Franklin's residence a few days later. Accordingly, this issue is without merit.

Defendant Franklin also challenges the validity of two aggravated robbery convictions for this act of criminal conduct. The State pursued dual convictions on the basis that there were two clerks in the store at the time of the robbery and both clerks were threatened with the gun. Defendant Franklin now contends that the dual convictions violate his protection against double jeopardy. See U. S. Const. Amend. 5; Tenn. Const. Art. I, Sec. 10.

Tennessee's appellate courts have not previously addressed this specific issue. The appellate courts of other jurisdictions have done so, however. See generally Facon v. State, 144 Md. App. 1, 796 A.2d 101 (2002), cert. granted, 801 A.2d 1031 (2002), and cases cited therein. In Wheat v. State, 297 Ark. 502, 763 S.W.2d 79 (1989), the Supreme Court of Arkansas considered the viability of three aggravated robbery convictions imposed upon a defendant following his armed robbery of a pharmacy. The defendant entered the pharmacy with a gun and forced two clerks to lie on the floor while the pharmacist gathered money and drugs into a bag. Only the pharmacy's property was taken, and the defendant made no effort to obtain any personal property from the clerks or pharmacist. The court merged the three aggravated robbery convictions into one, holding that the robbery "was a single transaction, the intention of which was to commit theft of the pharmacy property and not three separate offenses." Id., 763 S.W.2d at 80; see also, People v. Brinson, 216 A.D.2d 900, 629 N.Y.S.2d 555 (N.Y. App. Div. 1995) (holding that, although two persons were injured during the course of a robbery, only one conviction could stand because there was only one taking of property); Lundy v. State, 614 So.2d 674 (Fla. Dist. Ct. App. 1993) (holding that only one conviction could stand for the armed robbery of a restaurant safe although two employees were threatened because the only taking was from the safe and there was no evidence that the defendant intended to take money from the two employees); State v. Faatea, 65 Haw. 156, 648 P.2d 197, 198 (1982) (holding that an armed robbery of hotel with five employees threatened supported only a single robbery conviction on basis that robbery "is merely an aggravated form of theft" and robbery involved only a single theft from hotel).

Contrary to Arkansas, the Court of Appeals of Michigan has held that, "[w]hen a defendant assaults and robs two or more persons during a single incident, he may be charged with and convicted of more than one armed robbery." People v. Rodgers, 248 Mich. App. 702, 645 N.W.2d 294, 300 (2001) (affirming three convictions for armed robbery where armed defendant took money

from business's cash drawer while threatening three employees, irrespective of defendant's additional taking of cash from the person of one of the employees); see also Facon, 144 Md. App.1, 796 A.2d at 125 (holding that an armed assailant who threatens two convenience store clerks with a gun, but steals only store property, has committed two armed robberies); State v. Riley, 196 Ariz. 40, 992 P.2d 1135 (Ariz. Ct. App. 1999) (holding that an armed robbery of bank vault where six bank employees were threatened supported six separate robbery convictions); People v. Hamilton, 40 Cal. App.4th 1137, 47 Cal. Rptr.2d 343 (Cal. Ct. App. 1995) (noting that a defendant taking money at gunpoint from the presence of two store clerks would be subject to two convictions for robbery).

The determining factor in resolving this issue is the proper "unit of prosecution." See, e.g., Borchardt v. State, 367 Md. 91, 786 A.2d 631, 663 (2002). That is, should the state prosecute the crime on the basis of the number of victims, or on the basis of the number of thefts? As the Borchardt court recognized,

> Decisions are split around the country on whether a defendant may be convicted of more than one robbery when, in a single incident, he or she takes money or other property from the possession or presence of more than one person. Those holding that the individual victim is the unit of prosecution and that multiple convictions are valid stress the assaultive, rather than the larcenous, nature of the crime; those holding otherwise tend to emphasize the theft element.

786 A.2d at 663. The Court of Special Appeals of Maryland subsequently recognized that,

> In analyzing whether robbery is primarily regarded as a crime against persons or a crime against property, the courts also refer to the importance of discerning legislative intent with regard to whether there is one offense or multiple offenses. Some courts have also considered whether the particular statute in issue provides for different punishments depending on the value of the stole property, whether the courts are permitted to impose concurrent or consecutive sentences, or whether the state has available other offenses that can be charged for persons who were present at the time of the crime, such as assault.

Facon, 796 A.2d at122.

As set forth above, Tennessee's legislature has defined robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Thus, Tennessee's robbery statute is defined in terms of "theft." "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103. Our supreme court has recognized that, "[t]he element which distinguishes theft from robbery is the use of violence or fear." State v. Owens, 20 S.W.3d 634, 638 (Tenn. 2000). "Therefore, whether a taking is properly characterized as a theft or a robbery is contingent upon

whether and when violence or fear is imposed." Id. Indeed, Tennessee courts have frequently characterized the crime of robbery as "'an aggravated form of larceny.'" See, e.g., State v. Winsett, 217 Tenn. 564, 399 S.W.2d 741, 742 (Tenn. 1965) (quoting 54 C.J. 1010); Freeman v. State, 520 S.W.2d 739, 741 (Tenn. Crim. App. 1974).

Thus, Tennessee appears to distinguish robbery from theft on the basis of the method of the taking, rather than on the basis of from whom the property is taken. "It is violence that makes robbery an offense of greater atrocity than larceny." Winsett, 399 S.W.2d at 743. The method of the taking remains unaffected by the number of persons who may be threatened during the crime. Accordingly, we hold that the proper unit of prosecution for robbery in Tennessee is the number of takings, i.e. the number of thefts.[1] In this case, there was but a single theft.

Our analysis is in accord with our supreme court's decision in State v. Lewis, 958 S.W.2d 736 (Tenn. 1997). In Lewis, the defendant had set fire to a single apartment building which contained eight individual apartments. The fire destroyed five of the eight apartments. The defendant was subsequently convicted of five counts of aggravated arson. He challenged the multiple convictions on the grounds of double jeopardy, contending that, since he had set fire to only a single structure, only one conviction could stand. Our supreme court agreed.

Both our federal and state constitutions prohibit persons from being "twice put in jeopardy" for the same offense. See U.S.Const. 5th Amend.; Tenn. Const. Art. I, § 10; Lewis, 958 S.W.2d at 738. This prohibition against "double jeopardy" provides protection from three evils: (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense. See Lewis, 958 S.W.2d at 738. The case before this Court, as well as the case before the Lewis court, concern the issue of what constitutes the "same offense" for double jeopardy purposes.

In Lewis, the court framed the question as "whether a single act of arson that leads to the destruction of five apartments within one building constitutes one offense or five offenses under the arson statutes." Id. at 738. To answer the question, the court looked to legislative intent, as indicated by "'the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment.'" Id. at 739 (quoting Mascari v. Raines, 220 Tenn. 234, 239, 415 S.W.2d 874, 876 (1967)). The court also looked to that provision of our criminal code which indicates that statutes proscribing criminal conduct "are to be construed 'according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code.'" Id. (quoting Tenn. Code Ann. § 39-11-104). The court went on to recognize that our legislature "has the power to create multiple 'units of prosecution'

_____

[1]We recognize that Tennessee's robbery statutes are codified in Chapter 13 of our criminal code, the chapter which is titled "Offenses Against Person." We are reluctant to attach paramount significance to this fact, however, in light of our supreme court's defenestration of the Trusty decision, which attempted to designate certain crimes as lesser "grades" of other crimes on the basis of how they were classified in the criminal code. See State v. Trusty, 919 S.W.2d 305, 310-311 (Tenn. 1996), overruled by State v. Dominy, 6 S.W.3d 472, 477 (Tenn. 1999).

within a single statutory offense, but it must do so clearly and without ambiguity. Should the legislature fail in this duty, the ambiguity will be resolved in favor of lenity." Id.

> The court then turned to the conduct prohibited by our arson statute:
> A person commits an offense who knowingly damages any structure by means of a fire or explosion:
> (1) Without the consent of all persons who have a possessory, proprietary or security interest therein; or
> (2) With intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose.

Tenn. Code Ann. § 39-14-301(a) (1991) (emphasis added). Determining that the key phrase "any structure" referred to the entire structure which contained the individual apartments, rather than to the individual component parts of the single building, the court held that the proper unit of prosecution for an act of arson is the number of discrete structures burned: not each of the component parts thereof. See Lewis, 958 S.W.2d at 738-39.

Similarly, we have determined that the proper unit of prosecution for aggravated robbery in Tennessee is the number of thefts rather than the number of victims. Because the language of the robbery statute does not clearly and unambiguously designate the number of victims as the proper unit of prosecution, our supreme court's mandate favoring lenity prevails. In this case, the Defendants committed a single theft from the Amoco market, albeit from the presence of two persons, by the display of a handgun. That is, the Defendants each committed one aggravated robbery, not two. Accordingly, double jeopardy principles require that the second aggravated robbery conviction against each Defendant be reversed. We acknowledge that Defendant Sandridge did not raise this issue on appeal. Nevertheless, we grant relief to him in order to correct an error of constitutional dimension and to prevent manifest injustice. See Tenn. R. Crim. P. 52(b); State v. Lewis, 958 S.W.2d 736, 738 (Tenn. 1997).

That is not to say that the Defendants are not each guilty of two crimes. One who intentionally or knowingly displays a gun to another, and thereby causes the other to reasonably fear imminent bodily injury, has committed an aggravated assault. See Tenn. Code Ann. § 39-13-102(a)(1)(B). Here, each of the two victims was threatened with a gun during the course of the robbery. Mr. Hutcherson testified that the display of the weapon caused him to be fearful and he further testified that his co-worker, Mary Jasani, was also "very upset" by the gun and begged the gunman not to hurt them. Because aggravated assault is a lesser-included offense of aggravated robbery, see State v. Jason C. Carter, No. M1998-00798-CCA-R3-CD, 2000 WL 515930, at *8 (Tenn. Crim. App., Nashville, Apr. 27, 2000), each of the Defendants was also charged with this crime in each of the two counts alleging aggravated robbery. Thus, the evidence is sufficient to support a conviction against each Defendant of aggravated assault as a lesser-included offense of aggravated robbery.

In summary, we modify one of each of the Defendant's aggravated robbery convictions to a conviction of Class C aggravated assault.[2]  We remand this matter for resentencing on the aggravated assault convictions.  In all other respects, we affirm the judgment of the trial court.

_____

DAVID H. WELLES, JUDGE

---

[2]The evidence in this case is sufficient to support either of the aggravated robbery convictions against each Defendant.  However, victim Jasani, who was a co-owner of the store, suffered the actual loss of the cash that was stolen during the robbery.  Accordingly, under the facts of this case, we suggest that the trial court reduce the conviction arising from the charge naming Mr. Hutcherson as the victim.  By doing so, we in no way mean to diminish the seriousness of the attack upon Mr. Hutcherson.