# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 2, 2012

## STATE OF TENNESSEE v. RICCO R. WILLIAMS

**Appeal from the Circuit Court for Lauderdale County**
**No. 8856     Joseph H. Walker, III, Judge**

**No. W2011-02365-CCA-R3-CD  - Filed January 14, 2013**

A Lauderdale County Circuit Court jury convicted the defendant, Ricco R. Williams, of five counts of especially aggravated kidnapping, one count of aggravated burglary, two counts of aggravated robbery, one count of employing a firearm during the commission of a dangerous felony having been previously convicted of a felony, and one count of unlawful possession of a firearm by a convicted felon.  The trial court imposed an effective sentence of 72 years' incarceration.   On appeal, the defendant challenges the sufficiency of the convicting evidence and also contends that the jury was exposed to prejudicial information during voir dire and that the imposition of partially consecutive sentences violated his Sixth Amendment right to a trial by jury.  Because the trial court committed plain error by failing to require the State to elect a predicate felony for the defendant's conviction under Code section 39-17-1324 and because 39-17-1324(c) precludes the defendant's conviction when the underlying dangerous felony is aggravated kidnapping or especially aggravated kidnapping as charged in this case, the defendant's convictions in counts seven and ten are reversed, and those charges are remanded for a new trial on the offense of employing a firearm during the commission of an aggravated burglary.  Because principles of double jeopardy preclude dual convictions for the aggravated robberies of Mr. and Ms. Currie, the defendant's conviction of the aggravated robbery of Ms. Currie is reversed and modified to a conviction of the lesser included offense of aggravated assault.  Because the evidence was insufficient to support the defendant's conviction of unlawful possession of a firearm by a convicted felon, that conviction is reversed, and the charge is dismissed.  The defendant's convictions of and sentences for especially aggravated kidnapping, aggravated burglary, and the aggravated robbery of Mr. Currie are affirmed.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part; Reversed and Remanded in Part; Reversed and Modified in Part; Reversed and Dismissed in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

George Douglas Norton, Jr., Ripley, Tennessee, for the appellant, Ricco R. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Joni R. Livingston and Julie K. Pillow, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant's convictions arose from his participation in the June 1, 2009 home invasion robbery at the home of Timothy and Sherita Currie, during which the Curries and Ms. Currie's three children were held hostage at gunpoint while the defendant and two other men ransacked their home.

Sherita Currie testified that, in June 2009, she and her then-fiancé, Timothy Currie, shared their home with her three children, 13-year-old A.R., 17-year-old K.R., and 19-year-old M.R.[1] Ms. Currie picked her oldest daughter up from work, and both returned home a short time after midnight on June 1. Ms. Currie recalled that A.R. and K.R. were already asleep when she returned home, but Mr. Currie was watching television in the living room. She and Mr. Currie watched television for a few minutes before retiring to bed some time around 1:00 a.m.

Ms. Currie testified that the sound of glass breaking woke her at 1:15 a.m. She said that Mr. Currie ran down the hallway to the front of the house, while she went to the bedroom shared by the younger two children. From her children's bedroom, Ms. Currie overheard Mr. Currie say, "Man, what the F y'all doing?" followed by a "commotion" in the hallway. Ms. Currie and the two younger children walked to the living room and discovered Mr. Currie "on his knees with his head bleeding." At that point, Ms. Currie observed three individuals in the living room. One individual, armed with a crowbar and later identified as the defendant, wore an "orange ski mask," "red hoodie sweatshirt," and "orange Tennessee Vols jogging pants." Another individual, armed with a nine millimeter pistol, wore a short-sleeved black t-shirt and jeans. The third individual, armed with an "AK-47," wore a gray sweatshirt with black jeans and a black "do-rag."

Ms. Currie testified that the three men cursed her and the children and ordered them to "[d]rop it off" – a reference to surrendering money or drugs. Ms. Currie testified that no one in her family was involved in drugs or any other illegal activity, so she asked, "Are y'all sure y'all got the right house?" She said that the men then threatened to bind them with

---

[1]To protect the anonymity of the younger victims, we will refer to Ms. Currie's children by their initials. *See State v. Sexton*, 368 S.W.3d 371, 378 (Tenn. 2012).

duct tape and "burn the house down with [them] in it." They also threatened to bind Mr. Currie and "drop" him in the Mississippi River. She testified that the defendant kicked in M.R.'s bedroom door and ordered her to the living room.

Ms. Currie recalled that she and her family were not free to leave at any time and that the men kept their weapons drawn throughout the incident. She said that the man holding the assault rifle stayed in the living room while the other two men went through the house "just destroying things." At one point, the man wearing the black t-shirt ordered K.R. to a bedroom to collect cellular telephones. The men took jewelry and money from the home.

Ms. Currie testified that the entire incident lasted approximately 40 minutes and that it came to an end when officers from the Ripley Police Department ("RPD") knocked on the front door. When she heard the knock, Ms. Currie "just yelled out" for assistance, and the three assailants immediately fled to the back of the house. She then heard two gunshots. Officers discovered a crowbar and duct tape inside the home among items abandoned by the assailants.

On cross-examination, Ms. Currie testified that the assailants' "eyes were glassy, really like they were on some type of drugs." She said that although the men wore masks she was certain that all three individuals were African American. She recalled the defendant's lifting K.R.'s hair with the crowbar and that the assailants wore either gloves or socks on their hands throughout the incident. She said that the three assailants fled her home through a bedroom window in the back of the house.

Timothy Currie testified that, in June 2009, he shared a home with Ms. Currie and her three children. On June 1 at approximately 1:15 a.m., he heard glass breaking and went to the front of the home to investigate. As he walked down the hallway toward the living room, someone approached him and put a gun to his head. The assailant ordered Mr. Currie to "[d]rop it off" – slang for demanding money or drugs. Mr. Currie and the individual "got to tussling," and the man struck Mr. Currie twice in the head with the butt of the gun. Mr. Currie fell to his knees, and the man ordered him to the living room couch. Mr. Currie testified that he suffered two "gashes" to his head.

Once inside the living room, Mr. Currie observed three individuals: one man armed with a crowbar who wore orange jogging pants, one man armed with an "AK-47" rifle who wore a gray sweatshirt and jeans, and another man armed with a handgun who wore a black t-shirt and jeans. The men ordered Ms. Currie and the children to the living room

while they ransacked the home in search of valuables. The assailants threatened to bind the family with duct tape, throw Mr. Currie in the Mississippi River, and burn his family in the house. Mr. Currie recalled the assailants' ordering K.R. to another room at some time during the 45-minute ordeal. Mr. Currie testified that he and his family were not free to leave, and he believed that they would die. He said that the men stole approximately $150 in cash and some jewelry from the home.

On cross-examination, Mr. Currie testified that he knew the defendant as someone who had dated his neighbor, Lisa Cohill. Mr. Currie stated that he mowed Ms. Cohill's yard for extra money. He denied finding the defendant's wallet while mowing the yard. He acknowledged, however, that he did not identify the defendant as one of the assailants on the night of the incident. When shown crime scene photographs depicting some displacement of evidence, Mr. Currie testified that the investigators who took the photographs and collected the evidence could better explain any discrepancies in the photographs.

K.R. testified that she knew the defendant from spending time at Ms. Cohill's home. She said that she was familiar with the defendant's voice, the way he walked, and the clothing he wore. She recognized the "orange Tennessee Vols pants" as belonging to the defendant. She also testified that the defendant "would compliment [her] hair and sometimes . . . pull it up" when she visited Ms. Cohill. She explained that the defendant walked with "a certain swag" or distinctive way of walking.

K.R. testified that, on June 1, she was asleep when she heard a loud noise. Her mother rushed into the bedroom she shared with her brother. When they "heard of a bunch of commotion," the three walked to the living room and found Mr. Currie on the floor. She ran to Mr. Currie's assistance because he was bleeding. As she sat on the floor, one of the assailants "flipped" her hair with a crowbar. She looked up because this startled her and reminded her of the defendant. K.R. testified that this individual "mutter[ed]" in an effort to disguise his voice while the other men did not "mutter." After seeing the man's braids from beneath the hood of his sweatshirt and observing his distinctive walk, K.R. determined the assailant to be the defendant. She said that she told Ms. Cohill that the defendant was one of the assailants immediately after the incident.

K.R. recalled that the defendant and his confederates, all of whom were African-American males, threatened to bind the family with duct tape. They also threatened to throw Mr. Currie in the river and burn their home. She recalled that one of the

-4-

unidentified assailants wore a gray sweatshirt and black jeans and carried an assault rifle. The other unidentified assailant wore a black t-shirt and jeans and carried a handgun.

At some point during the 45-minute incident, the individual with the handgun directed K.R. to a bedroom to collect cellular telephones. She asked the man if he planned to kill them, and he told her that they only wanted money. The man then left her unattended for a few minutes, and she telephoned 9-1-1. When the man returned, she hurriedly unplugged the telephone. The man then ordered her to return to the living room.

K.R. testified that after she returned to the living room, the assailants lined each family member in front of the window and threw the duct tape to the floor in preparation for binding each victim. She recalled that at that point officers from the RPD knocked on the front door and announced their presence. Ms. Currie screamed for help, and the assailants ran to the back of the home to escape. She said that she heard gunshots and glass breaking as the men fled.

On cross-examination, K.R. admitted that she did not identify the defendant as one of the assailants in her written statement to the police that night. She nevertheless reaffirmed her certainty that he was the man wearing "UT pants" who moved her hair with the crowbar. She also testified that she did not know that a wallet containing the defendant's driver's license had been found at the scene.

M.R. testified that her mother picked her up from work some time before midnight on May 31, 2009. When she came home, she took a shower and went to bed. She said that she locked her bedroom door before retiring. She described "waking up with a gun to [her] head" after one of the assailants kicked in her bedroom door. She said that the men ransacked her bedroom, stealing money and jewelry. M.R. described the three assailants, as well as their weapons, consistently with those descriptions provided by her other family members. She testified that she was unable to identify the perpetrators and was also unfamiliar with the defendant.

A.R. testified that his mother woke him and K.R., and they heard a commotion in the hallway that they later determined to be the assailants' assaulting Mr. Currie. He specifically remembered that one assailant carried an assault rifle, and he admitted that he did not have a good memory of the other two assailants. He testified that he was afraid that he and his family would die that night and that he wanted to forget the incident.

Lisa Cohill, the victims' neighbor, testified that she and the defendant dated for several months. She said that she ended the relationship in April 2009 because the defendant became violent. In the early morning hours of June 1, she woke to the sound of gunshots and looked out her window to see two men fleeing the victims' home. Ms. Cohill met a crying and "visibly upset" K.R. in the yard, where K.R. immediately identified the defendant as one of the assailants. Ms. Cohill testified that the defendant telephoned her on June 2. She told him that he was a suspect in the incident and that he should talk to the police to "clear it up."

On cross-examination, Ms. Cohill acknowledged that she first met the defendant while employed at West Tennessee State Penitentiary ("WTSP"), where the defendant was an inmate and that they began dating after his release on parole. She testified that the defendant did not own a wallet while they dated. She said that she took him to obtain a driver's license after his release from prison and that he kept the driver's license in his pocket. Ms. Cohill was certain that the defendant had his driver's license when they broke up because she recalled his getting "carded" when she dropped him off at a Memphis store after their breakup. She admitted that she had written to the defendant while he was in jail awaiting trial.

RPD Officer Chris Bailey testified that he responded to a 9-1-1 report of a burglarized home. He arrived at the same time as RPD Officer Jeremy Hardee, and the two officers walked to the front door and listened at the door for 30 to 45 seconds before knocking and announcing their presence. Officer Bailey recalled that, as a voice directed them to a side door, "you could hear like a ruckus going on inside" the home. Mr. Currie quickly appeared at the side door and let the officers inside. Officer Bailey observed the assailants fleeing from the back of the house. As the men fled, they "split into a V," so Officer Bailey followed the closest suspect in a southerly direction away from the home. He then heard gunshots and returned to the home to ensure that no one had been shot.

Once inside the home, Officer Bailey observed that "it looked like a tornado had went through it. It was stuff strewed all over the place." He noted that the assailants had entered the home through a broken window on the side door and that they fled the home through a broken rear bedroom window. Officer Bailey's examination of the evidence at the scene revealed a black wallet among some broken glass underneath the rear bedroom window. The wallet contained the defendant's driver's license. Officer Bailey recalled that there was a heavy dew on the ground but that the wallet was dry. From this, he determined that someone had recently dropped the wallet in the grass.

-6-

On cross-examination, Officer Bailey testified that he did not submit the wallet or the crowbar for fingerprint analysis. He also testified that he observed no blood on either broken window. He recalled that he discovered the wallet within 15 minutes of arriving at the scene. To his knowledge, the wallet was the only evidence of the defendant's presence at the scene; he did not recall that anyone identified the defendant as a suspect that night.

RPD Investigator Louis Ruff testified that he arrived at the scene to find it already secured by Officers Bailey and Hardee. Investigator Ruff discovered no evidence of illegal drug activity in the victims' home and said that he had not known any of the victims to be involved in any unlawful behavior. He discovered duct tape and a crowbar on a chest freezer in the kitchen. Investigator Ruff testified that the entire house was "in disarray."

Investigator Ruff testified that the assailants broke a window on a side door, enabling them to unlock the door and gain entry. His examination of the door revealed no blood evidence. Similarly, he found no blood evidence on the broken bedroom window through which the assailants fled the home. He testified that the only blood evidence discovered in the home was that of Mr. Currie. The investigators did not discover any fingerprint evidence and, therefore, decided not to send any items to the crime laboratory for analysis.

Investigator Ruff testified that he questioned K.R. at the scene and that she identified the defendant as one of the assailants based upon the defendant's "distinctive" walk and clothing. He maintained that K.R. identified the defendant without knowing that the defendant's wallet had been found at the scene.

RPD Investigator Terry Jordan testified that he assisted Investigator Ruff in collecting evidence at the crime scene. He discovered a black "do-rag" in the yard. He testified that, although the item was sent to the crime laboratory for analysis, the "do-rag" contained insufficient material for identification analysis.

Lauderdale County Sheriff's Department Sergeant Mark Crook responded to the report of shots fired at the crime scene. With the assistance of Investigator Clay Newman, he set up a perimeter to search for the fleeing assailants. He discovered attic insulation in a nearby wooded area that he determined came from the victims' attic. Sergeant Crook also observed footprints in the yard showing the direction of the assailants' flight. He testified that a wallet found at the scene was dry. He recalled that the wallet contained not only the defendant's driver's license, but also an EBT card and prepaid Walmart card both

in the defendant's name.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a full *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 159, 161-62 (Tenn. 1999), the defendant elected not to testify. The defendant presented no evidence. The jury convicted the defendant as charged on all 11 counts of the indictment:

| Count | Conviction |
|---|---|
| 1 | especially aggravated kidnapping of Timothy Currie accomplished with a deadly weapon, to wit: an AK-47 |
| 2 | especially aggravated kidnapping of Sherita Currie accomplished with a deadly weapon, to wit: an AK-47 |
| 3 | especially aggravated kidnapping of M.R. accomplished with a deadly weapon, to wit: an AK-47 |
| 4 | especially aggravated kidnapping of K.R. accomplished with a deadly weapon, to wit: an AK-47 |
| 5 | especially aggravated kidnapping of A.R. accomplished with a deadly weapon, to wit: an AK-47 |
| 6 | aggravated burglary |
| 7 | employing a firearm during the commission of a dangerous felony |
| 8 | aggravated robbery of Timothy Currie accomplished with a deadly weapon, to wit: an AK-47 |
| 9 | aggravated robbery of Sherita Currie accomplished with a deadly weapon, to wit: an AK-47 |
| 10 | sentence enhancement for employing a firearm during the commission of a dangerous felony having been previously convicted of aggravated assault and voluntary manslaughter |
| 11 | possession of a firearm having been previously convicted of a felony |

On appeal, the defendant contends that plain error occurred when potential jurors disclosed information during voir dire that the defendant had previously been incarcerated, that the evidence was insufficient to support his convictions, and that the trial court violated the defendant's Sixth Amendment rights by imposing partially consecutive sentences in this case. Because we perceive problems with the defendant's convictions of aggravated robbery, employing a firearm during the commission of a dangerous felony, and possession of a firearm by a convicted felon that are intertwined with the issue of the sufficiency of the evidence, we choose to organize our analyses of the evidence by conviction rather than by issue. We will then address the issues of jury taint and sentencing.

*I. Especially Aggravated Kidnapping*

The defendant challenges the sufficiency of the convicting evidence, specifically complaining that "the extremely meager evidence" presented in this case "is almost entirely circumstantial" and, therefore, cannot sustain his convictions. The State argues that the evidence established the defendant's guilt.

We review the defendant's claims of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in counts one through five, especially aggravated kidnapping is "false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be

a deadly weapon." T.C.A. § 39-13-305(a)(4) (2006). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a).

Although the defendant argues that a different standard of review attends this "almost entirely circumstantial" case, our supreme court has clarified "that direct and circumstantial evidence should be treated the same when weighing sufficiency of such evidence." *Dorantes*, 331 S.W.3d at 381 (citations omitted). Moreover, K.R.'s eyewitness identification of the defendant as one of the assailants was direct evidence to support his convictions. *See, e.g.*, *State v. Coulter*, 67 S.W.3d 3, 69 (Tenn. Crim. App. 2001); *Echols v. State*, 517 S.W.2d 18, 23 (Tenn. Crim. App. 1974). Each victim's testimony concerning their removal to and confinement in the living room of their home while the defendant and his henchmen, one of whom was armed with an "AK-47" as was alleged in the indictment, rifled through the rooms of the home in search of valuables for approximately 45 minutes supports the defendant's convictions of five counts of especially aggravated kidnapping.

## II. Aggravated Burglary

The defendant was charged with and convicted of aggravated burglary of the Currie residence in count six. "Aggravated burglary is burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." *Id.* § 39-13-403(a). Burglary, as is applicable in this case, is committed when a person "without the effective consent of the property owner . . . [e]nters a building . . . with the intent to commit a . . . theft." *Id.* § 39-14-402(a)(1).

Both Mr. and Ms. Currie testified that the sound of breaking glass woke them in the early morning hours. Three armed men, including the defendant, entered their home without permission by breaking in at the side door. The men demanded money and rifled through the home in search of valuables. This evidence supports the defendant's conviction of aggravated burglary.

## III. Employing a Firearm During a Dangerous Felony

As charged in count seven, "it is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." T.C.A. § 39-17-1324(b)(1). The indictment in this case alleged that the defendant employed a firearm during the commission of "Aggravated Kidnapping and Aggravated Burglary," both of which are designated as dangerous felonies.

*See id.* § 39-17-1324(i)(1)(F), (H).  The defendant was also charged in count ten with a violation of Code section 39-17-1324(f), which provides:

> In a trial for a violation of subdivision (a) or (b), where the state is also seeking to have the person sentenced under subdivision (g)(2) or (h)(2), the trier of fact shall first determine whether the person possessed or employed a firearm.  If the trier of fact finds in the affirmative, proof of a qualifying prior felony conviction pursuant to this section shall then be presented to the trier of fact.

*Id.* § 39-17-1324(f).  The defendant was then sentenced pursuant to Code section 39-17-1324(h)(2), which provides that "[a] violation of subsection (b) is a Class C felony, punishable by a mandatory minimum ten-year sentence to the department of correction, if the defendant, at the time of the offense, had a prior felony conviction."  *Id.* § 39-17-1324(h)(2).

Although the State showed that the defendant indeed employed a firearm during the home invasion robbery at the Currie residence by virtue of his being criminally responsible for his compatriots' brandishing firearms, we perceive plain error relative to the defendant's conviction for employing a firearm during the commission of a dangerous felony in count seven.

Before an error may be recognized as plain, it "must be 'plain' and it must affect a 'substantial right' of the accused."  *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994).  Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *United States v. Olano*, 507 U.S. 725, 732 (1993) (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

> (a) the record must clearly establish what occurred in the trial court;

-11-

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

First, the State charged two predicate dangerous felonies, aggravated kidnapping and aggravated burglary, but did not elect the predicate felony upon which it intended to rely to support the defendant's conviction. Indeed, the record reflects that the trial court instructed the jury that it could base the defendant's conviction on any of three predicate felonies: especially aggravated kidnapping, aggravated kidnapping, and aggravated burglary. In *State v. Trutonio Yancey and Bernard McThune*, No. W2011-01543-CCA-R3-CD (Tenn. Crim. App., at Jackson, Sept. 17, 2012), this court observed that "in cases in which 'there is technically one offense, but evidence of multiple acts which would constitute the offense, a defendant is still entitled to the protection of unanimity,'" *State v. Trutonio Yancey and Bernard McThune*, No. W2011-01543-CCA-R3-CD, slip op. at 13-14 (Tenn. Crim. App., Jackson, Sept. 17, 2012) (quoting *State v. Forbes*, 918 S.W.2d 431, 446 (Tenn. Crim. App. 1995)), and held that "the trial court committed plain error in not requiring the State to elect upon which felony it relied to support the charge of employing a firearm during the commission of a dangerous felony," *Trutonio Yancey and Bernard McThune*, slip op. at 12; *see also, e.g.*, *State v. Jeremiah Dawson*, No. W2010-02621-CCA-R3-CD (Tenn. Crim. App., Jackson, May 2, 2012), *perm. app. denied* (Tenn. Sept. 20, 2012) (holding that the State is required to elect when multiple dangerous felonies are alleged in indictment for violation of Code section 39-17-1324). The State's failure to elect the predicate felony upon which it intended to rely, on its own, would have resulted in plain error requiring reversal.

Moreover, the trial court erroneously instructed the jury that it could convict the defendant of a violation of Code section 39-17-1324 based upon its finding that he

employed a firearm during the commission of especially aggravated kidnapping. Although the defendant was charged with the especially aggravated kidnappings of the Curries and Ms. Currie's children, count seven specifically alleged predicate felonies of aggravated kidnapping and aggravated burglary. Again, the trial court's instructional error would have warranted reversal of the defendant's conviction under Code section 39-17-1324.

Even if the trial court's instructional error had not warranted reversal, Code section 39-17-1324(c) would have. That section provides that "[a] person may not be charged with a violation of subsection (a) or (b) if possessing or employing a firearm is an essential element of the underlying dangerous felony *as charged*." T.C.A. § 39-17-1324(c) (emphasis added). In this case, one of the predicate dangerous felonies charged in the indictment was aggravated kidnapping. No specific means of aggravated kidnapping was alleged, but the defendant was charged with especially aggravated kidnapping by use of "a deadly weapon, *to wit: an AK-47*," the same weapon alleged in the count charging a violation of Code section 39-17-1324. (Emphasis added). Consequently, Code section 39-17-1324(c) precluded the defendant's conviction for employing a firearm during the commission of aggravated kidnapping or especially aggravated kidnapping. *See Anthony D. Byers v. State*, No. W2011-00473-CCA-R3-PC, slip op. at 11 (Tenn. Crim. App., Jackson, Mar. 15, 2012), *perm. app. denied* (Tenn. Aug. 15, 2012).

Because the State's failure to elect warrants reversal and because the defendant cannot be convicted of employing a firearm during the commission of aggravated kidnapping as charged in this case or especially aggravated kidnapping because it was not alleged in the indictment, the defendant's conviction for employing a firearm during the commission of a dangerous felony is reversed, and the charge in count seven is remanded for a new trial. The offense to be tried upon remand is employing a firearm during the commission of a dangerous felony, and the predicate felony shall be aggravated burglary.

Because the defendant's conviction in count ten for a violation of Code section 39-17-1324(f) was a sentencing enhancement based upon the defendant's conviction for violating Code section 39-17-1324(b), that charge must also be remanded for a new trial along with the offense of employing a firearm during the commission of an aggravated burglary.

## IV. Aggravated Robbery

The defendant was convicted in counts eight and nine of the aggravated

robberies of Mr. and Ms. Currie, respectively.  As charged here, "[a]ggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon."  *Id.* § 39-13-402(a)(1).  "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."  *Id.* § 39-14-103(a).

Both Mr. and Ms. Currie testified that the defendant and his companions took items from the residence, including jewelry and cash, and that one of the defendant's companions was armed with an AK-47, as was alleged in the indictment.  These facts were sufficient to support either aggravated robbery conviction.

That being said, we perceive a problem with the defendant's dual convictions of aggravated robbery.  Although the issue has not been raised by either party, we recognize as plain error the imposition of two robbery convictions in this case as violative of double jeopardy principles.

In *State v. Franklin*, 130 S.W.3d 789 (Tenn. Crim. App. 2003), this court "determined that the proper unit of prosecution for aggravated robbery in Tennessee is the number of thefts rather than the number of victims" and held that when the evidence establishes a single taking from the presence of more than one person, only one conviction of aggravated robbery may be sustained.  *State v. Franklin*, 130 S.W.3d 789, 798 (Tenn. Crim. App. 2003).  Here, the proof established that the defendant and his confederates took collective property from the presence of both Mr. and Ms. Currie such that only a single taking resulted.  Thus, as in *Franklin*, "double jeopardy principles require that the second aggravated robbery conviction . . . be reversed."  *Id.*  As was also the case in *Franklin*, however, the evidence supports a modification of the aggravated robbery conviction in count nine to a conviction of aggravated assault as a lesser included offense of aggravated robbery. *See id.*  The conviction of aggravated robbery in count eight is affirmed.

*V.  Possession of a Firearm by a Convicted Felon*

As charged in this case, "[a] person commits an offense who unlawfully possesses a firearm, as defined in § 39-11-106, and . . . [h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon."

-14-

Tennessee courts recognize that "'possession' may be either actual or constructive." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *see also State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). A person constructively possesses an item when he or she has "'the power and intention at a given time to exercise dominion and control over [the contraband] either directly or through others.'" *Shaw*, 37 S.W.3d at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). Said differently, constructive possession is the "ability to reduce an object to actual possession." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "mere association with a person who does in fact control the [item] is insufficient to support a finding that the person possessed [it]." *Cooper*, 736 S.W.2d at 129. In addition to being constructive, possession may also be joint. *Key v. State*, 563 S.W.2d 184, 188 (Tenn. 1978). In the case of possession of a firearm, "[c]onstructive or joint possession may occur only where the personally unarmed participant has the power and ability to exercise control over the firearm." *Id.*

In this case, although ample evidence established that the defendant's accomplices were both armed with firearms, no proof established that the defendant had the power or ability at any time to exercise control over those firearms. As such, no proof showed that the defendant actually, constructively, or jointly possessed a firearm.

Moreover, although the State argues that the defendant's conviction could be supported based upon his criminal responsibility for the conduct of his accomplices, the law does not support a conviction on that basis. "A person is criminally responsible for an offense committed by the conduct of another, if . . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2). Thus, to support the defendant's conviction of possession of a firearm by a convicted felon as charged in this case, the State was required to prove that the defendant solicited, directed, aided or attempted to aid another person in the commission *of that offense.* There was no proof that the defendant's firearm-wielding companions had been previously convicted of a felony involving the use of force, violence, or a deadly weapon. Indeed, there was no proof that either man had been previously convicted of any crime because neither man was identified at trial. As a result, the defendant's conviction of possession of a firearm by a convicted felon must be reversed, and that charge must be dismissed.

*VI. Jury Taint*

The defendant argues that plain error occurred during jury selection when two prospective jurors disclosed their knowledge of the defendant as a former WTSP inmate gained via their employment at the penitentiary. The State argues that the defendant failed to establish plain error.

During general jury selection, one potential juror disclosed during general voir dire that she was an employee at WTSP and that she recalled the defendant's being an inmate. She further indicated that this particular knowledge of the defendant might affect her ability to impartially review the evidence. The trial court excused this juror for cause and issued a curative instruction indicating that "it will not be contested that the defendant has a prior felony conviction." Subsequently, another potential juror indicated that she was employed as an inmate coordinator at WTSP and, therefore, might have some familiarity with the defendant. The trial court also excused this juror for cause. The defendant took no action to strike the jury pool based upon the remaining potential jurors' exposure to this information. Therefore, the defendant has waived plenary review of this issue and is limited to plain error review. *See* Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

The term "extraneous information" may include a juror's personal knowledge of the defendant's prior criminal record or arrest, *see* Neil P. Cohen, et al., *Tennessee Law of Evidence* § 606.2 (3rd ed. 1995), and such information is deemed prejudicial if it has an influence on the verdict of the jury, *see Patton v. Rose*, 892 S.W.2d 410, 414 (Tenn. Ct. App. 1994). Although the defendant is entitled to a verdict untainted by extraneous, prejudicial information, the defendant bears the burden of establishing jury misconduct. *State v. Blackwell*, 664 S.W.2d 686, 688-90 (Tenn. 1984).

When both potential jurors disclosed their knowledge of the defendant, the trial court excused them for cause and, in the case of the first juror, issued a curative instruction regarding the defendant's previous status as an inmate at WTSP. During voir dire, the defendant's counsel acknowledged the defendant's convicted felon status and questioned the prospective jurors regarding each person's ability to set aside that fact in examining the evidence at trial. No remaining prospective juror indicated any prejudice or bias concerning the defendant's felon status. Later at trial, the parties stipulated that the defendant had been

previously convicted of a felony. Furthermore, during the cross-examination of Ms. Cohill, the defendant's counsel elicited from Ms. Cohill that she met the defendant while working at WTSP where the defendant was an inmate at the time. Under these circumstances, we perceive no error.

## *VII. Consecutive Sentencing*

In his final issue, the defendant contends that the trial court's imposition of partially consecutive sentences violates his Sixth Amendment rights. The defendant argues that this court should revisit our supreme court's decision in *State v. Allen*, 259 S.W.3d 671 (Tenn. 2008) (ruling Sixth Amendment challenges inapt to Tennessee's consecutive sentencing statute). Both the United States Supreme Court and the Tennessee Supreme Court have held that the Sixth Amendment considerations attendant to the trial court's imposition of sentence length are not implicated by the trial court's decision regarding alignment of sentences. *See Oregon v. Ice*, 555 U.S. 160, 172 (2009); *State v. Allen*, 259 S.W.3d 671, 688 (Tenn. 2008). "Our appellate review is governed by the adjudications of the supreme judicial tribunal of [the United States] and the state; the precedents that flow therefrom are final and conclusive upon all inferior tribunals, including, of course, this intermediate appellate court." *Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004) (citing *Fletcher v. State*, 951 S.W.2d 378, 381 (Tenn. 1997); *Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976)). Accordingly, the defendant's challenge to the trial court's imposition of consecutive sentences must fail.

## *Conclusion*

The defendant failed to establish plain error concerning the empaneling of the jury in this case. The State presented sufficient evidence to support the defendant's convictions of especially aggravated kidnapping and aggravated burglary. We perceive plain error, however, with respect to the defendants convictions of aggravated robbery, employing a firearm during the commission of a dangerous felony, and possession of a firearm by a convicted felon. Because principles of due process preclude the imposition of two aggravated robbery convictions in this case, the defendant's conviction of the aggravated robbery of Ms. Currie in count nine is reversed and modified to a conviction of aggravated assault. That count is remanded for resentencing. The aggravated robbery conviction in count eight is affirmed. Because the trial court committed plain error by failing to make the State elect the predicate felony upon which it intended to rely and because Code section 39-17-1324 prohibits the use of especially aggravated kidnapping and aggravated kidnapping as predicate felonies under the facts of this case, the defendant's convictions in counts seven and ten relative to the violation of Code section 39-17-1324 are reversed, and those counts are remanded for a new trial on the offense of employing a firearm during the commission

of a dangerous felony predicated upon an aggravated burglary. Because the evidence was insufficient to support the defendant's conviction of possession of a firearm by a convicted felon, that conviction is reversed, and count eleven is dismissed. The imposition of partially consecutive sentences is affirmed.

Accordingly, the judgments of the trial court are affirmed in part; reversed and modified in part; reversed and remanded in part; and reversed and dismissed in part.

_____
JAMES CURWOOD WITT, JR., JUDGE